COURT OF APPEALS OF VIRGINIA

Present:   Judges Annunziata, Clements, and Kelsey
Argued at Salem, Virginia


EWELL JAMES OWENS
                                                          OPINION BY
v.        Record No. 3140-02-3                    JUDGE D. ARTHUR KELSEY
                                                          DECEMBER 16, 2003
THELMA JOSEPHINE WADE OWENS


FROM THE CIRCUIT COURT OF BUCHANAN COUNTY
Michael L. Moore, Judge

Robert M. Galumbeck (Dudley, Galumbeck, Necessary and
Dennis, on brief), for appellant.

Monica Taylor Monday (Robert B. Altizer; Gentry Locke
Rakes & Moore; Gillespie, Hart, Altizer & Whitesell, P.C.,
on brief), for appellee.


Ewell James Owens appeals four aspects of the trial court's equitable distribution award

in this divorce case.  He claims the trial court erred by failing to (a) apply a minority discount to

his stock in a closely held company, (b) reduce the award to account for tax consequences that

would arise upon a future sale of the stock, (c) adjust the award to back out his personal wages

from the company that had been previously incorporated into the cash-flow valuation model, and

(d) allow him more than four months to pay the cash award before docketing the monetary

judgment against him.  Finding that the chancellor did not abuse his discretion, we affirm.

I.

When reviewing a chancellor's decision on appeal, we view the evidence in the light

most favorable to the prevailing party, granting her the benefit of any reasonable inferences.

Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 835 (2003).  "That principle

requires us to discard the evidence of the appellant which conflicts, either directly or inferentially, with the evidence presented by the appellee at trial." Id. (citations and internal quotation marks omitted).

Ewell Owens ("husband") and Thelma Owens ("wife") married in 1989. By final decree dated October 30, 2002, the trial court granted wife a final divorce on no-fault grounds. The chancellor heard *ore tenus* evidence regarding equitable distribution of the marital property. Neither party sought spousal support.

The marital property included, among other things, husband's shares in Dominion Office Products, Inc., a closely held corporation started by husband and his brother in 1989. They own equal shares of the business. To assist in the venture, wife signed promissory notes guaranteeing the loans for start-up capital. When the company failed to produce income in the first few months, wife returned to full-time employment as a nurse to support the family, which included their two children and two children from husband's prior marriage. Wife also maintained health insurance for the entire family from 1989 to 1997. While working part time, wife attended law school at Appalachian School of Law. After passing the bar in 2000, wife took a job working at a law firm in Abingdon, Virginia, earning $50,000 a year.

Dominion Office Products, Inc. operates as a retail office supply and equipment business that also provides maintenance and repair services. Husband is president of Dominion, and his brother is secretary and treasurer. Husband also works as one of five salesmen for the company, while his brother manages the office. As equal owners, husband and his brother over the years have received the same salary and drawn the same bonuses twice a year. Their income from the business has grown steadily from about $77,000 each in 1999, to $85,000 each in 2000, and then to almost $90,000 in 2001. The company has never declared any dividends. It leases its

premises from J&E Leasing L.L.C. ("J&E"), another company owned equally by husband and his brother.

At trial, the chancellor received differing expert opinions from accountants hired by husband and wife to value Dominion.[1]  Both accountants employed variations of the capitalization-of-earnings approach.  Wife's accountant, Raymond Froy, used a "monthly net revenue" model that produced a total value of $1,067,527 and an alternative "owner's cash flow" model that resulted in a total value of $1,255,853.  This latter model extrapolated equity value by capitalizing earnings using a multiple of 3 against an adjusted annual revenue stream.

Froy testified that he would not reduce this valuation figure (either for a minority discount, potential tax liabilities, or husband's salary adjustments) because such changes presuppose a sale of the shares — an assumption Froy said he did not make.  Froy also pointed out that, at the end of the most recent financial reporting cycle, the company had about $140,000 cash-on-hand after the payment of officers' salaries.  The average monthly income had increased over the past three years by 42%.  The company, Froy concluded, was "[v]ery profitable."

Husband's expert, Steve Wood, also served as the company's accountant.  He too used the "owner's cash flow" model and produced two values:  $871,320.68 with a multiple of 2, and $1,163,923.52 with a multiple of 3.  Wood, however, then adjusted these valuations by reducing them with a one-third minority discount ($145,074.89 and $193,793.27 respectively), a further reduction for estimated capital gains tax ($74,825.75 and $99,953.39 respectively), and an adjustment for the husband's salary ($100,000 and $150,000 respectively).  These changes reduced the husband's share of the multiple 2 valuation figure to $115,759 and the multiple 3 figure to $138,215.10.

---

[1]  The parties do not dispute on appeal any aspect of the valuation or distribution of the stock shares in J&E Leasing L.L.C.

Wood supported his position on the minority discount by asserting that any equity interest in a closely held company less than 51% should be considered a "minority interest" and should be discounted in value by one third to reflect the absence of decisionmaking control. The amount of the discount turns, Wood stated, on "the amount of control that the person has over the corporation." Because Dominion has two equal owners, he concluded, "no one has a majority interest in this corporation." If he were "advising a potential buyer," Wood explained, he would calculate a minority discount into the purchase price of a 50% equity interest in Dominion.

With respect to the capital gains tax, Wood agreed that the equitable distribution award standing alone had no tax consequences. But if husband had to sell his shares of the company to a third person to raise funds to pay a cash award, Wood pointed out, a capital gains tax would be assessed against him as the seller. Absent such a sale, he conceded, no capital gains tax liability would accrue because no taxable gain would be realized.

Wood also advocated backing out of the valuation model the portion of husband's salary attributable to his salesman position as well as the portion of his brother's salary attributed to his manager's position. Wood argued that upon a sale of the company the new owner would likely replace husband and his brother with two new employees. As Wood explained it: "The theory was that if they were not there running the business, someone would have to be paid to do their jobs and that was the basis for reducing the salaries." Wood thus added $100,000 to the revenue column (before applying the multiplier), a figure roughly representing a $50,000 salary for husband and his brother.

When asked about the "intrinsic value" concept used in domestic relations law and the various market-driven models used in commerce, Wood said he would only "tentative[ly] agree"

that a distinction should exist between the two. In his way of thinking, "the only way to come up with a value of something is what is it worth if you sell it."

The chancellor heard considerable testimony on whether it would be necessary for husband to sell his shares in the company. Wood testified that husband would likely "have to either *borrow* money *or* sell a *part* of his interest in the company" to pay any significant cash award ordered by the court. At no point in his testimony, however, did Wood state that a reasonable loan could not be obtained from either Dominion, J&E, or an institutional lender. Nor did he specifically say that, even with a loan, a partial sale would still be probable. And he never testified that a sale of all shares would be required. Finally, Wood offered no suggestion that any independent business reason (unrelated to the divorce) would make a sale likely. "We hope not to sell the business," Wood explained.

When questioned about a possible sale of the business, husband testified that he would not ask his "brother to do that because of the effort he's put forth in that business." Like Wood, husband offered no information about the availability of any loans on the open market secured by a stock pledge from Dominion or J&E or whether he could borrow funds directly from either of his corporations to create liquidity. Nor did he or Wood testify about what portion of his Dominion stock might be liquidated and how a partial sale of that stock would affect the various discounts requested.

After hearing this evidence, the chancellor accepted the lower of the two valuation figures offered by husband's expert. This placed the company's value at $871,320 (using a multiple of 2) and made husband's 50% interest worth $435,660. The court refused, however, to reduce this figure with the three adjustments requested by husband and recommended by Wood. Dominion, the court noted, was "being valued for equitable distribution purposes, not for sale."

No evidence persuaded the chancellor that a sale was probable, much less necessary. Husband filed a motion to reconsider, which the trial court denied.

In its final decree, entered on October 30, 2002, the trial court distributed to husband his shares in Dominion (valued at $435,660) and J&E (valued at $80,428), one-half of the retirement and investment accounts, and various personalty. The court distributed to wife the marital residence (valued at $110,000), one-half of the retirement and investment accounts, and various personalty. The final decree also awarded $196,700 to wife and ordered that the docketing of this monetary judgment against husband be deferred for four months following the final decree.

II.

We begin with the governing standard of review. A decision involving the equitable distribution of marital property "rests within the sound discretion of the trial court," Mir v. Mir, 39 Va. App. 119, 125, 571 S.E.2d 299, 302 (2002) (citation omitted), and can be overturned only by a showing of an abuse of that discretion. "An abuse of discretion can be found if the trial court uses 'an improper legal standard in exercising its discretionary function,'" Congdon, 40 Va. App. at 262, 578 S.E.2d at 836 (citation omitted), because "a trial court 'by definition abuses its discretion when it makes an error of law,'" Shooltz v. Shooltz, 27 Va. App. 264, 271, 498 S.E.2d 437, 441 (1998) (quoting Koon v. United States, 518 U.S. 81, 100 (1996)).

A trial court also abuses its discretion by failing "to consider the statutory factors required to be part of the decisionmaking process," Congdon, 40 Va. App. at 262, 578 S.E.2d at 836-37 (citing Rowe v. Rowe, 24 Va. App. 123, 139, 480 S.E.2d 760, 767 (1997)), or by making "factual findings that are plainly wrong or without evidence to support them," id. at 262, 578 S.E.2d at 837 (citing Northcutt v. Northcutt, 39 Va. App. 192, 196, 571 S.E.2d 912, 914 (2002)). When a chancellor hears evidence *ore tenus*, we give his findings "great weight" on appeal,

Watts v. Watts, 40 Va. App. 685, 690, 581 S.E.2d 224, 227 (2003); King v. King, 40 Va. App. 200, 212, 578 S.E.2d 806, 813 (2003), because, unlike us, he has the "opportunity to see and hear that evidence as it is presented," Thomas v. Thomas, 40 Va. App. 639, 644, 580 S.E.2d 503, 505 (2003) (quoting Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995)) (internal quotation marks omitted).  In this respect, his findings have the "same weight as a jury verdict" and are entitled to the same level of deference.  Chesterfield Meadows Shopping Ctr. Assocs., L.P. v. Smith, 264 Va. 350, 355, 568 S.E.2d 676, 679 (2002).  For these reasons, we will not decide any appeal "on the basis of our supposition that one set of facts is more probable than another."  Fox v. Fox, 41 Va. App. 88, 96, 581 S.E.2d 904, 908 (2003) (citation and internal quotation marks omitted).

III.

A.   Minority Interest Discount

Virginia's equitable distribution law employs the concept of "intrinsic value" when determining the worth of certain types of marital assets.  See Howell v. Howell, 31 Va. App. 332, 339, 523 S.E.2d 514, 517 (2000).  "Intrinsic value is a very subjective concept that looks to the worth of the property to the parties."  Id.  It cannot be limited by objective criteria commonly used in open market transactions:

> The item may have no established market value, and neither party may contemplate selling the item; indeed, sale may be restricted or forbidden.  Commonly, one party will continue to enjoy the benefits of the property while the other must relinquish all future benefits.  Still, its intrinsic value must be translated into a monetary amount.  The parties must rely on accepted methods of valuation, but the particular method of valuing and the precise application of that method to the singular facts of the case must vary with the myriad situations that exist among married couples.

Id. at 339, 523 S.E.2d at 517-18; Bosserman v. Bosserman, 9 Va. App. 1, 6, 384 S.E.2d 104, 107 (1989) (observing that Virginia courts "must determine from the evidence that value which represents the property's intrinsic worth to the parties").

The intrinsic value principle applies to stock in a family owned company. Closely held shares may be subject, for example, to mandatory buy-out provisions at artificially low prices. Such provisions "do not necessarily represent the intrinsic worth of the stock to the parties" and thus are "not conclusive as to the value of the stock." Bosserman, 9 Va. App. at 6, 7, 384 S.E.2d at 108. The marketability restriction should be viewed simply as one factor in the valuation model. Id. Further, when the controlling interests in a family company oppress a minority shareholder or use a "substantial amount of the corporation's assets" for their own personal benefit, the trial court may take that fact into consideration in determining the value, if any, of the minority interest. Jacobs v. Jacobs, 12 Va. App. 977, 979, 406 S.E.2d 669, 671 (1991). But when no evidence suggests that the stock should be "discounted because it represented a minority holding," Bosserman, 9 Va. App. at 9, 384 S.E.2d at 110, the trial court should give the stock its proportionate value.

In this case, husband argues that the chancellor "misinterpreted" the meaning of a minority interest and that "anything less" than a 51% interest should be deemed a minority interest requiring — as a matter of law — the application of a minority discount. We disagree. When analyzed under the intrinsic value approach, husband's position as a 50% owner does not necessarily mandate the use of a minority discount. Though husband's brother serves as office manager, no evidence suggested the brother ever used this position to exercise authoritarian control of the company or in any way to imperil husband's equal share of the distributive profits. Nor did any evidence show that the brothers have ever disagreed about the strategic direction of the company or disputed among themselves the management of the finances.

While the potential for disharmony always exists between co-owners, so too do legal and equitable remedies. Virginia law requires all directors to exercise their fiduciary duties to preserve the best interests of the corporation, Code § 13.1-690(A), provides remedies when a director acts "in a manner that is illegal, oppressive, or fraudulent" or has "misapplied or wasted" corporate assets, Code § 13.1-747(A)(1)(b) & (d), authorizes derivative suits in equity where appropriate, Code §§ 13.1-672.1 to 13.1-672.5,[2] and provides a mechanism to dissolve a corporation and to distribute its assets in the face of an intractable director deadlock, Code §§ 13.1-747(A)(1) (stock companies) & 13.1-909(A)(1) (nonstock companies).

In this case, given the absence of any suggestion of actual oppression relating to husband's alleged minority status coupled with the availability of judicial remedies for the most egregious forms of potential oppression, we reject husband's assertion that his position as an equal co-owner should entitle him as a matter of law to a minority discount for equitable distribution purposes.

Husband also argues that he may have to sell his stock shares to raise the necessary funds to pay the equitable distribution award. In this context, he reasons, the minority discount approximates "how much less money will be available for distribution if he were to sell any of his interest." This argument relies not on any actual prejudice to his equity position due to its alleged minority status, but rather on the perceived prejudice third-party buyers may fear if they were to buy husband's stock. Sometimes coupled with (or simply labeled) a marketability discount,[3] this particular adjustment presupposes a probable sale of the stock. If a sale is

---

[2] "Derivative suits play an important role in protecting shareholders of corporations from the designing schemes and wiles of insiders who are willing to betray their company's interests in order to enrich themselves." Simmons v. Miller, 261 Va. 561, 573, 544 S.E.2d 666, 674 (2001) (internal quotation marks and citation omitted).

[3] See, e.g., Rowe v. Rowe, 33 Va. App. 250, 266, 532 S.E.2d 908, 916 (2000) (noting that "deflated values" had been used because "the stock was discounted due to generally limited

improbable, the discount need not be applied. See, e.g., Howell, 31 Va. App. at 345, 523 S.E.2d at 521 (approving trial court's rejection of minority and marketability discounts for a minority equity interest in a law partnership where "no transfer of the partnership interest was foreseeable and no one in the firm, nor any group within it, exercised majority control").

The evidence in this case failed to persuade the chancellor that a sale was probable. We see no basis to overturn this factual finding on appeal. At trial, husband's expert merely speculated that husband would likely "have to either *borrow* money *or* sell a *part* of his interest in the company" to pay a cash award.[4] When asked directly what his intentions were, husband denied any interest in selling any of his shares and made clear he would do so only if it were absolutely necessary. Neither husband nor his expert witness, however, provided any evidence addressing the availability of a stock-pledge loan from either of husband's companies or from any institutional lenders. Nor did either provide any reliable basis for the chancellor to conclude a sale (whether partial or total) would be a reasonable response to the unavailability of financing or the high cost of obtaining it. The chancellor, therefore, did not abuse his discretion by refusing to apply a minority discount under these circumstances.

B.   Trapped-In Capital Gains Tax Liability

---

marketability of stock in a closely-held corporation"); Ellington v. Ellington, 8 Va. App. 48, 57, 378 S.E.2d 626, 631 (1989) (approving chancellor's rejection of an unspecified "discount factor for lack of marketability of the husband's minority interest"); Zipf v. Zipf, 8 Va. App. 387, 395, 382 S.E.2d 263, 268 (1989) (discussing "discount for lack of marketability" of closely held shares).

[4] Moreover, under husband's approach, the difference between selling all shares and some shares could be significant. The requested one-third discount, when applied to all of husband's shares, would be a $145,074 reduction. If applied only to a portion (say, for example, 25% of his shares), the reduction would be only $36,268. To make matters worse, the calculation involves a moving target. The need for liquidity to pay a cash award depends on the total amount awarded. That amount, of course, depends in part on the size of the discount. Having addressed none of these contingencies and offered no reliable prediction of how many shares (if any) would need to be sold, husband further diluted the persuasiveness of his position in the trial court.

Husband contends that the trial court should have adjusted the equitable distribution award to reflect the fact that, whether probable or not, a future sale of his shares would trigger the imposition of capital gains tax. We agree that the trial court has discretion to make such an adjustment if the circumstances warrant, but disagree that not doing so in this case constitutes an abuse of that discretion.

Every appreciating asset has a cost basis that serves as a baseline for determining capital gains tax liability. As a general rule, the gain is realized and the tax imposed upon the sale of the asset. When *valuing* an asset under Code § 20-107.3(A), the party asserting that the value of the asset should be discounted for capital gains tax liability must prove the probability of an actual, not merely hypothetical, sale of the asset. See Arbuckle v. Arbuckle, 22 Va. App. 362, 470 S.E.2d 146 (1996) (Arbuckle I), *later appeal*, 27 Va. App. 615, 500 S.E.2d 286 (1998) (Arbuckle II). This principle is no more than the application of the maxim that "valuation cannot be based on 'mere guesswork.'" Arbuckle II, 27 Va. App. at 618, 500 S.E.2d at 288 (observing that a discount assuming a sale should be disallowed if "too speculative"); see also Gary N. Skoloff, *et al.*, 3 Valuation and Distribution of Marital Property § 22.08[3][a], at 22-94 (2003) (noting that a discount "should be disallowed, however, absent proof that such a sale actually took place during the marriage or will occur in connection with dissolution"); Brett R. Turner, Equitable Distribution of Property § 8.10 (2d ed. 1994 & Supp. 2003) ("Most courts have held that tax consequences can be considered only if a taxable event is reasonably likely to take place at the time of divorce or within a reasonable time thereafter.").

Once the chancellor has valued the assets, however, he then must engage in the conceptually distinct task of determining a fair distribution of those assets between the parties. See Arbuckle II, 27 Va. App. at 618, 500 S.E.2d at 288. While engaged in this task, Code § 20-107.3(E)(9) directs the court to consider "tax consequences to each party" created by the

distribution of assets in an equitable distribution award. This injects a level of subjectivity into the decisional process not permitted during the valuation stage of an equitable distribution case, as a comparison of Arbuckle I and Arbuckle II well illustrates. The inability to prove a probable sale precluded the use of a capital gains tax debit on the valuation of the shares in Arbuckle I, but posed no impediment on the chancellor's decision to factor the potential tax liability into the distributive award in Arbuckle II. This seeming inconsistency stems from a fine, but critical, distinction in the statutory design. "After the valuation process is completed, the statutory scheme recognizes . . . that a degree of imprecision will be inevitable in applying the factors of Code § 20-107.3(E)." Arbuckle II, 27 Va. App. at 618, 500 S.E.2d at 288. As a result, when distributing assets, the trial court in the exercise of its discretion may take into account the fact that the spouse receiving an asset with a cost basis less than its fair market value will "bear the responsibility of the capital gains tax" if that spouse chooses to "later sell the property." Barnes v. Barnes, 16 Va. App. 98, 106, 428 S.E.2d 294, 300 (1993) ("The trial judge did not err by considering and noting that the tax law would require the husband to pay any future capital gains tax that may become due.").

Code § 20-107.3(E)(9), however, does not mandate that a trial court reduce an award for potential capital gains tax consequences no matter how certain or uncertain they may be. Subsection E(9) requires only that the trial court *consider* tax consequences when formulating an equitable distribution award. What weight, if any, to assign to this factor in the overall decision lies within the trial court's sound discretion. Under settled law, "the trial court *must* consider each of the statutory factors, but *may* determine what weight to assign to each of them." Thomas, 40 Va. App. at 644, 580 S.E.2d at 505 (emphasis added); see also Watts, 40 Va. App. at 698, 581 S.E.2d at 231. Along these lines, we have often "recognized that the trial court's job is a difficult one, and we rely heavily on the discretion of the trial judge in weighing the many

considerations and circumstances that are presented in each case." Thomas, 40 Va. App. at 644, 580 S.E.2d at 505 (quoting Gilman v. Gilman, 32 Va. App. 104, 115, 526 S.E.2d 763, 768 (2000)). The inevitable "degree of imprecision" noted in Arbuckle II, 27 Va. App. at 618, 500 S.E.2d at 288, therefore, cuts both ways. It affords the chancellor wide latitude to determine the weight of the subsection E(9) "tax consequences" factor standing alone as well as the strength of that particular factor when put into the larger context of all of the other statutory factors that must be considered.

Given these principles, we reject husband's argument that the trial court abused its discretion by failing to adjust the equitable distribution award to take into account husband's potential capital gains tax liability. The chancellor considered extensive testimony from the parties and their witnesses, heard oral argument both at trial and at the post-trial hearing on husband's motion to reconsider, and reviewed legal memoranda submitted by counsel. It thus cannot be said that the trial court failed to consider the issue.

It is true, as husband contends, that the chancellor assigned the E(9) factor no measurable weight in the decisional process — at least in the sense that he did not reduce the award because of any potential future tax liabilities. And we agree with husband that such a decision would be an abuse of discretion if it reflected the chancellor's mere disagreement with the statutory command to consider tax consequences. A trial court cannot deem legally insignificant what Code § 20-107.3(E) declares to be significant. That said, we see nothing in the chancellor's ruling suggesting that he took this view.[5] To the contrary, the record reflects that the court

---

[5] The trial court's decision overruling wife's objection to husband's cross-examination of her expert on potential tax liabilities demonstrates the court's appreciation for its task under Code § 20-107.3(E)(9): "I'm going to allow it. I understand that it cannot be used for valuation of the asset, I understand that, but I think that it's fair ground to ask an accountant the tax consequences because the Code requires the Court to consider it for purposes of equitable distribution and, certainly, I can ferret out the difference between the tax consequences in that realm and for the valuation of the property, so I'm going to allow it."

understood the relevance of the E(9) factor but nonetheless accepted wife's argument that the potential tax liability was too conjectural to warrant the requested adjustment. The chancellor also reaffirmed that — having considered "all the factors in this matter," not just E(9) — he believed the award was "fair and equitable under the statute." Because nothing in this record demonstrates that the chancellor abused his discretion in coming to that decision, we will not overturn it on appeal.

### C. Backing-Out Husband's Salary[6]

For similar reasons, we reject husband's argument that the chancellor erred by not backing out husband's salary from the cash-flow model during the distribution phase of this case.[7] On this issue, husband relies exclusively on his expert's opinion that husband's job "would have to be replaced, were the business sold." Having conceded that this adjustment presupposed husband would sell his shares, a hypothesis the trial court rejected as speculative, husband cannot demonstrate on appeal that the chancellor abused his discretion in likewise rejecting the proposed adjustment of the award based on the husband's salary.

---

[6] On appeal, husband does not challenge the trial court's failure to back out of the cash-flow valuation model the portion of his brother's salary. As a result, husband has waived any challenge to this omission as inconsistent with the intrinsic value approach or generally accepted accounting principles.

[7] Husband concedes that he has "no objection to the valuation of the assets," only the manner of their distribution. For this reason, we do not address whether husband's salary should have been included in the cash-flow model during the valuation stage. See generally Gary N. Skoloff, et al., 3 Valuation and Distribution of Marital Property § 22.08[3][a], at 22-93 (2003); Burnham-Steptoe v. Steptoe, 755 So. 2d 1225, 1235 (Miss. Ct. App. 1999) (en banc). Similarly, husband does not argue — and we do not address — whether inclusion of his salary in the valuation model unfairly duplicated his income for purposes of establishing child support. See Shannon Pratt, The Lawyer's Business Valuation Handbook 348-49 (2000) (The problem of "double dipping" can be "avoided if the valuation methodology truly follows the philosophy of not being dependent on future efforts (or restrictions on efforts) of the operating spouse.").

D.  Date of Docketing Judgment

Finally, husband argues that the trial court erred by ordering that the monetary award against husband be docketed four months from the date of the final decree entered on October 30, 2002.  We disagree.  "A monetary award in an equitable distribution proceeding is a judgment."  Booth v. Booth, 7 Va. App. 22, 31, 371 S.E.2d 569, 574 (1988).  Code § 20-107.3(D) states that an equitable distribution award "shall constitute a judgment within the meaning of § 8.01-426 and shall not be docketed by the clerk unless the decree so directs."  The date chosen by the chancellor for docketing the judgment lies within his sound discretion.

In this case, we see no basis for concluding that the four-month period provided by the trial court in its final decree constitutes an abuse of discretion.  Husband presented no evidence of any inability to use his substantial assets as collateral for financing the cash award, either through his two companies or through institutional lenders.  Though the trial court recognized it would not be "easy" for husband to pay the award, the court pointed out that he "received considerable assets in this distribution" and offered no persuasive reasons for delaying the imposition of his cash award liability beyond the docketing date chosen by the court.

IV.

Because the trial court's equitable distribution order in this case conforms to governing legal principles and involves decisions within the court's sound discretion, we affirm.

Affirmed.