COURT OF APPEALS OF VIRGINIA


Present:   Judges Frank, Kelsey and Senior Judge Overton
Argued at Richmond, Virginia


TINSLEY CAMPBELL AND
  CAMPBELL LUMBER CO., INC.

v.      Record No. 2287-04-2

COMMONWEALTH OF VIRGINIA
  DEPARTMENT OF FORESTRY                                OPINION BY
                                                  JUDGE D. ARTHUR KELSEY
HARRY D. CAMPBELL AND                                  JULY 19, 2005
  CAMPBELL LUMBER CO., INC.

v.      Record No. 2288-04-2

COMMONWEALTH OF VIRGINIA
  DEPARTMENT OF FORESTRY


            FROM THE CIRCUIT COURT OF BUCKINGHAM COUNTY
                        Richard S. Blanton, Judge

            J. Robert Snoddy, III, for appellants.

            Roger L. Chaffe, Senior Assistant Attorney General (Jerry W.
            Kilgore, Attorney General; John K. Byrum, Jr., Assistant Attorney
            General, on briefs), for appellee.


        The Virginia Department of Forestry imposed civil penalties against Tinsley Campbell,

Harry Campbell, and Campbell Lumber Co. for violating administrative emergency orders issued

under Code § 10.1-1181.2(C), an environmental statute governing silvicultural activities affecting

water quality.  Seeking to vacate these penalties, the Campbells and Campbell Lumber Co. appealed

to the circuit court under the Virginia Administrative Process Act (VAPA), Code § 2.2-4000 *et seq.*

The circuit court upheld the agency's decision.

We affirm in part, reverse in part, and remand. With one exception, substantial evidence supports the agency's decision to impose civil penalties and the manner in which the penalties were calculated. The fines assessed against Tinsley Campbell and Campbell Lumber Co. in Record No. 2287-04-2, however, must be remanded for recalculation.

I.

A. TINSLEY CAMPBELL & THE EGAN PROPERTY

Tinsley Campbell, a logging contractor for Campbell Lumber Co. (CLC), supervised a timber harvesting project on a tract of land owned by James Egan, Jr. Upon being notified of the project, the Virginia Department of Forestry sent E. L. Embrey to conduct a routine inspection on April 22, 2003. Embrey found water quality problems with two stream crossings on a haul road. The next day, April 23, Embrey met with Tinsley and Egan to explain the situation and to point out corrective actions necessary to remedy the problem. Pursuant to Code § 10.1-1181.2(C), Embrey issued a "Water Quality Emergency Special Order," which both Tinsley, the logger, and Egan, the landowner, signed that day. A copy was sent by certified mail to CLC, the timber owner.

The emergency order detailed the required corrective actions and ordered that they be completed by May 2, 2003. In the middle of the form, in all capital letters, it stated: "THIS EMERGENCY SPECIAL ORDER REQUIRES YOU TO STOP WORK IMMEDIATELY EXCEPT FOR CORRECTIVE ACTION." The emergency order made equally clear that failure "to comply may result in the issuance of civil penalties."

Tinsley stopped logging on April 23 and started work on the corrective actions required by the emergency order to protect the stream crossings. The next day, his father, Harry Campbell, called Embrey and asked him to inspect the corrective actions taken and "to see if logging . . . could continue on the tract." Embrey and another inspector went to the site that day and concluded that additional corrective actions needed to be done before logging could recommence.

Tinsley went back to work on the corrective actions and completed what he thought would be sufficient by April 25. Without requesting a reinspection, Tinsley recommended logging operations on that day. Three days later, on April 28, Embrey reinspected the site and discovered the ongoing logging operations. On April 29, Embrey issued a formal hearing notice citing Tinsley, CLC, and Egan for violating the stop-work directive. Egan followed up on April 30 with a letter of his own, demanding that Tinsley and CLC immediately stop all logging activities on his land. In response, Tinsley and CLC stopped logging on April 30. Embrey reinspected the site on May 5 and found the corrective actions taken by that date were sufficient to satisfy the conditions of the emergency order.

At the hearing, Embrey made clear he did not issue the citation based on the inadequacy or untimeliness of the corrective actions. Instead, Embrey testified, he issued the citation "solely based on the fact that the [emergency order] was violated when logging *did resume on the tract*." (Emphasis added.) Buck Kline, an engineer with the Department of Forestry, calculated a 7-day period of noncompliance from the day that Embrey "observed the haul road being used" to the "day the compliance check was made that showed that the road was in a stable, non-erodible condition." The start date of the 7-day period was April 28 and the end date was May 5.[1] At no point in the hearing did either Embrey or Kline assert that Tinsley conducted logging operations on April 23 or 24 in violation of the emergency order.

Kline also explained the Department of Forestry's request for a penalty of $10,780 to be divided between Tinsley and CLC. The figure came from a penalty matrix worksheet that determined a proposed fine based upon the seriousness of the violation, the type of natural resource

_____

[1] April is a 30-day month. If Kline counted both the start and end dates, the period would comprise 8 days. His testimony did not address whether his 7-day period counted the start date or the end date.

endangered, the culpability of the offenders, any prior history of noncompliance, and the presence or absence of good faith. The matrix produced a collective *per diem* penalty of $1,540, which was then multiplied by the 7-day period of noncompliance. The matrix also apportioned the $10,780 by attributing roughly 2/3 of the penalty to CLC and 1/3 to Tinsley.

After receiving this evidence, the hearing officer later issued a written "Findings of Fact and Conclusions of Law." In his written decision, the hearing officer imposed the 7-day fine in the exact amount determined by the penalty matrix prepared by Kline. Without explanation, however, the hearing officer used a different 7-day period. He began the period on April 23, the date of the emergency order, and ended the period on April 30, the date all logging ceased on the site.[2] The hearing officer also inverted the apportionment of the matrix, assigning 2/3 of the fine against Tinsley and 1/3 against CLC. Without commenting on these discrepancies, the state forester issued a final agency order imposing the penalties outlined in the hearing officer's written findings.

### B. HARRY CAMPBELL & THE CAMPBELL PROPERTY

Harry Campbell, Tinsley's father and a co-owner of CLC, engaged in timber harvesting on land owned jointly by him and his former wife, Betty Campbell, also a co-owner of CLC. On April 11, Embrey inspected this tract and found "a significant amount of water quality problems." He issued an emergency order and forwarded it by certified mail to Harry, who signed the receipt for the letter on April 14. The order required corrective measures to be completed by April 24. In the middle of the emergency order, in all capital letters, it stated: "THIS EMERGENCY SPECIAL ORDER REQUIRES YOU TO STOP WORK IMMEDIATELY EXCEPT FOR CORRECTIVE ACTION." It too provided that failure "to comply may result in the issuance of civil penalties."

---

[2] The hearing officer's specific finding was that "Both Tinsley Campbell and the Campbell Lumber Company failed to comply with the Special Order issued by Embrey *on* the 23rd day of April 2003 *until* the 30th day of April 2003." (Emphasis added.)

When Embrey returned to the property on April 24, he found that logging had continued without interruption since at least April 14 and that "relatively little" of the corrective actions had been accomplished. Logging work ceased on or about April 24. Embrey and Kline reinspected the property on May 2. By then, substantial corrective actions had been taken, but Kline observed that "a lot of the work still had not been done." Given the unresolved "water quality concerns on the tract," Embrey reported on May 2 that the emergency order remained "still in effect."

At the administrative hearing, Harry testified that he had various conversations with Embrey and others during on-site inspections. No one told him to stop logging work while attempting to take the required corrective actions. Harry also testified that he did not read the emergency order, and thus, was unaware of the stop-work directive. The hearing officer rejected Harry's testimony and imposed a $58,520 fine, split evenly between Harry and CLC. The hearing officer adopted the 19-day fine calculation produced by the agency's penalty matrix.

## II.

Tinsley Campbell, Harry Campbell, and CLC appealed the agency's final orders to the circuit court. See Code § 10.1-1181.5 (permitting VAPA judicial review of the state forester's final agency action). The circuit court affirmed the agency's decision. On appeal to us, the appellants argue the evidence presented to the hearing officer irrefutably contradicts his factual findings. The appellants also claim the agency's use of the penalty matrix violated its statutory duty to consider various factors under Code § 10.1-1181.3(A).

We hold that substantial evidence supports all but one aspect of the agency's decision. We also conclude the agency did not violate its statutory mandate by using the penalty matrix as a guide for calculating the civil penalties.

A.  SUFFICIENCY OF THE EVIDENCE

Under the VAPA, "the duty of the court with respect to issues of fact shall be limited to ascertaining whether there was substantial evidence in the agency record upon which the agency as the trier of the facts could reasonably find them to be as it did."  Code § 2.2-4027; see Vasaio v. DMV, 42 Va. App. 190, 196, 590 S.E.2d 596, 599 (2004).  We thus have authority to "reject agency factfinding 'only if, considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion.'"  Citland, Ltd. v. Commonwealth, 45 Va. App. 268, 274-75, 610 S.E.2d 310, 324 (2005) (quoting Mattaponi Indian Tribe v. Commonwealth, 43 Va. App. 690, 706, 601 S.E.2d 667, 675 (2004)) (emphasis in original).

(i)  Tinsley Campbell & CLC

Tinsley Campbell and CLC argue that the emergency order allowed them to resume logging on April 25 because, by then, the required corrective actions had been completed.  It was entirely unnecessary, they thought, for the agency to reinspect the property and to specifically withdraw the stop-work directive.  The hearing officer rejected this reading of the emergency order, holding that the "clear language of the [emergency order] indicates that Tinsley Campbell's interpretation is improper."  We agree.  The stop-work directive unequivocally forbids any work other than corrective action.  The order also directed Tinsley and CLC to "CONTACT THE VIRGINIA DEPARTMENT OF FORESTRY REGIONAL OFFICE UPON COMPLETION OF CORRECTIVE ACTION."  Nothing in the order suggests that Tinsley could unilaterally violate the stop-work directive when, in his judgment, the corrective actions had been completed.

Tinsley also claimed at the administrative hearing that Embrey made a remark during the April 24 site inspection implying that logging work could resume on a trial basis to see if the corrective actions would "hold up."  In his testimony, Embrey said he advised Tinsley during the April 24 visit that "the work required by the [emergency order] had not been met and that work

could not continue on the tract." In his written decision, the hearing officer did not state whether he found Tinsley's recollection credible. Instead, the hearing officer found the stop-work language of the emergency order rendered unreasonable any conflicting understanding Tinsley may have had from conversations with Embrey. Given the clarity of the emergency order, we find no basis to question the hearing officer's decision on this ground.

Tinsley and CLC also contest the hearing officer's decision to apportion the penalty by assessing 2/3 of the fine against Tinsley and 1/3 against CLC, roughly the opposite of the apportionment suggested by the agency's penalty matrix. We concede this reallocation had a substantial impact on the amount each violator had to pay. The facts of this case, however, provide a rational basis for the hearing officer's exercise of discretion on this ground. Tinsley made the decision to recommence logging in violation of the stop-work directive. As a contractor for CLC, a corporate entity, Tinsley could be deemed the more culpable of the two.

Tinsley and CLC next argue that no evidence supports the hearing officer's decision to start the 7-day noncompliance period on April 23. On this point, we agree. Code § 10.1-1181.3 provides that any "owner or operator who violates, or fails or refuses to obey any special order may be assessed a civil penalty by the State Forester." "Each day of a continuing violation may be deemed a separate violation for purposes of assessing penalties" but the penalty "shall not exceed $5,000 for each violation." Code § 10.1-1181.3(A). The statute grants broad discretion for the calculation of each *per diem* violation, but necessarily forbids assessing *per diem* penalties for days in which no violations took place.

In this case, Embrey conceded that the citation rested "solely" on the failure to comply with the stop-work directive. Embry never asserted that Tinsley and CLC engaged in logging on April 23 after receiving the stop-work directive. Nor did Embrey ever claim a violation of the stop-work directive on April 24, the day he inspected the corrective actions and found them inadequate. The

first violation of the stop-work directive took place on April 25 when Tinsley unilaterally recommenced logging after completing what he thought were sufficient corrective actions.[3]

It is unclear whether the hearing officer intended to substitute the 7-day period of April 23 to 30 (the period of noncompliance found in his written findings) for the agency's 7-day period of April 28 to May 5 (as set forth in the agency's penalty matrix) or whether he simply made an inadvertent mistake in reciting the dates. Either way, it was an obvious error — one implicating our duty of judicial review because, on this issue, "a reasonable mind would *necessarily* come to a different conclusion." Citland, Ltd., 45 Va. App. at 274-75, 610 S.E.2d at 324 (citations omitted & emphasis in original).

For these reasons, to the extent the penalties against Tinsley and CLC include a *per diem* fine for April 23 or 24, that portion has no basis in fact given the absence of any evidence of noncompliance on those dates. Vacating any portion of the penalties attributable to April 23 or 24, we remand this matter to the circuit court with instructions to further remand the case to the Department of Forestry for purposes of recalculating these penalties.[4]

(ii) Harry Campbell & CLC

Harry Campbell and CLC argue that the hearing officer erred in finding that they violated the stop-work directive and in calculating the 19-day period of noncompliance. We disagree. As a factfinder, the hearing officer was entitled to reject Harry's claim that he either misunderstood or

---

[3] On appeal, Tinsley and CLC have abandoned their argument before the circuit court that the evidence also fails to prove violations of the stop-work directive on either Saturday, April 26, or Sunday, April 27.

[4] Here again, *supra* n.1, the 7-day period of noncompliance found by the hearing officer started "on" April 23 and ran "until" April 30. Including both the start and end dates yields an 8-day period. A literal interpretation of "until" — as opposed to "through" — would exclude April 30. See American Heritage Dictionary 1266, 1326 (2d ed. 1985); Webster's New World Dictionary 1395, 1464 (3d ed. 1986). On the other hand, a colloquial use of the word "until" perhaps could include April 30. We leave to the agency on remand the task of clarifying its findings on this point.

was simply unaware of the stop-work directive of the emergency order. The evidence also supports the hearing officer's conclusion that "logging had been going on without interruption since at least the 14th day of that month although relatively little of the work outlined in the Emergency Stop Order and its Amendments had been carried out" as of April 24. On May 2, Embrey and Kline reported substantial, though still incomplete, compliance. Under this fact pattern, the period starting on April 14 and ending on April 24 constitutes an 11-day violation of the stop-work directive. The period starting on April 25 and ending on May 2 constitutes an 8-day violation of the deadline set in the emergency order for completing the corrective actions. Thus, the evidence supports the hearing officer's finding of a 19-day violation of the emergency order.

### B.   STATUTORY MANDATE OF CODE § 10.1-1181.3(A)

We also reject the assertion that the use of the penalty matrix produced an "arbitrary, unreasoned result" in violation of the statutory mandate of Code § 10.1-1181.3(A). The calculation of fines represents an exercise in highly discretionary decisionmaking, subject only to the statutory cap of $5,000 per day. See Code § 10.1-1181.3(A). Though the penalty matrix attempts to impose a measure of uniformity and predictability on the ultimate decision, it nevertheless retains the elusiveness of a judgment call rather than the certitude of an algebra equation.[5] Absent truly extraordinary circumstances, therefore, we have no authority to judicially superintend the calculation of administrative fines assessed within their statutory limits.

---

[5] The Department of Forestry treats the penalty matrix as an administrative "guidance document" under Code § 2.2-4001. As such, it represents the agency's effort to interpret and implement statutes within its administrative responsibility. Such documents "do not purport to be a substitute for the statute." Davenport v. Summit Contractors, Inc., 45 Va. App. 526, 533, 612 S.E.2d 239, 243 (2005) (quoting Jackson v. W., 14 Va. App. 391, 399, 419 S.E.2d 385, 389 (1992)).

Along the same lines, the appellants also argue that the hearing officer and the agency violated Code § 10.1-1181.3(A) by not making sufficiently specific findings. We again disagree. Code § 10.1-1181.3(A) states:

> In determining the amount of the penalty, *consideration shall be given* to the owner's or operator's history of noncompliance; the seriousness of the violation, including any irreparable harm to the environment and any hazard to the health or safety of the public; whether the owner or operator was negligent; and the demonstrated good faith of the owner or operator in reporting and remedying the pollution.

(Emphasis added.) A statutory command to consider certain decisionmaking factors does not mean the factfinder must assign "measurable weight in the decisional process" to each factor or somehow quantify its impact on the final decision. Owens v. Owens, 41 Va. App. 844, 860, 589 S.E.2d 488, 496 (2003).[6] It means merely the factfinder "cannot deem legally insignificant" what the statute "declares to be significant." Id. Nothing in the hearing officer's decision or the agency's adoption of it suggests either violated this principle.

### III.

With one exception, the circuit court correctly upheld the civil penalties assessed by the Department of Forestry against Tinsley Campbell, Harry Campbell, and CLC. In Record No. 2288-04-2, we affirm the circuit court on all issues. In Record No. 2287-04-2, we vacate that portion of the penalties attributed to April 23 and 24 because no evidence demonstrates a violation of the stop-work directive on those dates. We remand that case to the circuit court with instructions

---

[6] An opposite principle applies when a statute requires a specific finding as a precondition to agency action. See, e.g., Browning-Ferris Indus. of S. Atl., Inc. v. Residents Involved in Saving the Env't, Inc., 254 Va. 278, 492 S.E.2d 431 (1977) (interpreting Code § 10.1-1408.1(D) to require the agency to make an explicit determination before a permit could be issued).

to further remand it to the Department of Forestry for a recalculation of the civil penalties in a manner consistent with this opinion.

Affirmed in part, reversed in part & remanded.