PRESENT: All the Justices

WEST VIRGINIA & APPALACHIAN LABORERS'
DISTRICT COUNCIL

                                                OPINION BY
v. Record No. 240315                            JUSTICE CLEO E. POWELL
                                                MARCH 27, 2025
STATE CORPORATION COMMISSION, ET AL.


FROM THE STATE CORPORATION COMMISSION

The West Virginia & Appalachian Laborers' District Council ("WVALDC") appeals the decision of the State Corporation Commission ("Commission") granting the application of Sycamore Cross Solar LLC ("Sycamore") for certificates of public convenience and necessity ("CPCN"). The WVALDC argues that the Commission failed to consider the Projects' benefits to the groups enumerated in Enactment Clause 7 of the Virginia Clean Economy Act ("VCEA"), failed to make specific findings of fact related to the specified groups, and abused its discretion in declining to impose a hiring-related condition in the CPCN. For the reasons that follow, we affirm the judgment of the Commission.

## I. BACKGROUND

In July 2023, Sycamore filed an application and supporting documents with the Commission for CPCNs to construct and operate a solar facility totaling up to 240 megawatts with transmission lines and associated facilities to interconnect to the grid (the "Project"). The Project would be located in Isle of Wight County and Surry County (the "Counties"). The application asserted that the Project would provide economic benefits to the Counties and surrounding area, as well as promote the renewable energy policies and goals set forth in the

Commonwealth Clean Energy Policy ("CCEP") and VCEA.[1] *See* Code § 45.2-1706.1; 2020 Va. Acts chs. 1193, 1994. Sycamore included an economic and fiscal impact analysis prepared by Mangum Economics as an exhibit to the application (the "Mangum Report"). The Mangum Report estimated that the Project would create 197 full-time jobs during construction and 7 full-time jobs during operation. The WVALDC, a labor organization that represents over 6,300 workers in Virginia, West Virginia, and North Carolina, filed a notice of participation in the case.

In November 2023, a Hearing Examiner conducted an evidentiary hearing, in which Sycamore, the WVALDC, and Commission staff participated.[2] Gregory Creswell, a witness for Sycamore, testified that the Project would provide positive economic benefits through increased tax revenue, employment opportunities, and the use of local businesses. Relevant to the VCEA, he noted that the Project site is not located in a "historically economically disadvantaged area." Creswell also reiterated the job projections from the Mangum Report. Creswell represented that Sycamore was "committed to hiring local employees" and would make "best efforts to work with contractors and identify opportunities for local workforce." However, he stated that Sycamore

---

[1] Enactment Clause 7 of the VCEA provides:

> That it shall be the policy of the Commonwealth that the State Corporation Commission . . . in the development of energy programs, job training programs, and placement of renewable energy facilities, shall consider whether and how those facilities and programs benefit local workers, historically economically disadvantaged communities . . . veterans, and individuals in the Virginia coalfield region that are located near previously and presently permitted fossil fuel facilities or coal mines.

2020 Acts. chs. 1193, 1994.

[2] All relevant witnesses pre-filed their direct testimony, which was admitted into evidence at the hearing.

2

had not "made a firm commitment" to a quantity or percentage of local jobs. He explained that Sycamore would likely hire a contractor to be responsible for hiring, but had not done so yet, and that Sycamore was at least one year away from hiring for the Project. On cross-examination, Creswell acknowledged that it would be possible to include a local hiring goal for the contractor to achieve, and that the hiring assumptions in the Mangum Report were realistic.

Anthony Ciani, a representative for the WVALDC, testified that the organization supported the Project on the condition that Sycamore followed through on its representation to hire a majority local workforce to construct the Project. Ciani testified to the benefits of using local labor, including maximizing local economic benefits and creating quality job opportunities that align with the policies and goals of the CCEP and VCEA. He noted that, "to date, many of the solar developments in Virginia have been built by out-of-state, low-wage workers."

Matthew Glattfelder, a Commission analyst, testified that Commission staff generally agreed that the Project would provide some direct and indirect economic benefits to the Counties, including construction jobs. With regard to a separate statutory requirement that the Commission consider the environmental impact of the Project,[3] he stated that although 3.7% of the fenced area of the Project is designated as an environmental justice community,[4] specifically a community of color, no homes are located within the fenced acreage.

---

[3] *See* Code § 56-265.2(B) (requiring the Commission, in reviewing a CPCN application, to consider the effect of the proposed facility on the environment); Code § 2.2-235 (stating that "[i]t is the policy of the Commonwealth to promote environmental justice and ensure that it is carried out throughout the Commonwealth, with a focus on environmental justice communities and fenceline communities").

[4] Code § 2.2-234 (defining "environmental justice community" as "any low-income community or community of color").

During closing arguments, the WVALDC reiterated its position that Sycamore's local hiring representations should be binding like any other condition. Sycamore rejected imposing a local hiring commitment because it did not "know what the circumstances [would] be, [or] what the workforce [would] look like" a year in advance.

The Hearing Examiner issued a 34-page report, which summarized the evidence and her findings, and recommended that the Commission issue the requested CPCNs. Relevant to this appeal, the Hearing Examiner did not find that the Commission should condition the CPCNs on Sycamore hiring a majority of local workers for the Project. The Hearing Examiner noted that, absent a legal requirement or Commission precedent, imposing a local hiring requirement was a policy decision for the Commission. However, the Hearing Examiner recommended that Sycamore's "reasonable efforts" should include notifying the WVALDC either when it would begin hiring or when it signed a contract with the contractor responsible for hiring.

In its final order, the Commission adopted the Hearing Examiner's findings and recommendations but declined to adopt the proposed notification requirement. The Commission noted that Sycamore represented that it would make reasonable efforts to hire local laborers and explained that neither a local hiring requirement nor notice are "necessary to satisfy the statutory requirements for approval."

The WVALDC moved for reconsideration. First, the WVALDC argued that the Commission failed to address the enumerated groups in the VCEA. To the extent that the final order could be construed to make the requisite findings, the WVALDC argued the Commission's findings were not supported by substantial evidence, which rendered the decision arbitrary and capricious. Second, the WVALDC argued that Commission failed to explain its decision not to

4

impose any hiring-related condition, including the Hearing Examiner's proposed notification requirement.

In its order on reconsideration, the Commission stated that it "considered the evidence in the record on (1) whether and how the Project benefits the individuals and communities identified in Enactment Clause 7 of the VCEA, as well as (2) the effect of the Project on the furtherance of the economic and job creation objectives of the CCEP." The Commission expressly stated that it considered the Hearing Examiner's Report, including pages 25-28, which contained the economic development, local hiring, and environmental justice subsections. The Commission concluded that neither Enactment Clause 7 of the VCEA nor the CCEP "required any specific directive or finding as a result of the Commission's consideration thereunder." Ultimately, the Commission exercised its discretion to not place any hiring-related conditions in the CPCN for several reasons. First, the Commission explained that there is no legal requirement or Commission precedent for imposing such a condition. Second, the Commission noted that it found "reasonable and credible" the local hiring assumptions in the Mangum Report, as well as Sycamore's representations "to use reasonable efforts to use local hiring." Third, the Commission noted the difficulty imposed by a hiring requirement given the hiring timeline.

## II. ANALYSIS

### A. Compliance with the VCEA

The WVALDC argues that the Commission's orders should be vacated because the Commission needed to both consider and make findings related to each of the enumerated groups in the VCEA, and a mere statement that the Commission "considered" the groups is not enough. The WVALDC contends that the record lacked evidence as to how the Project would benefit

5

historically disadvantaged communities, veterans, or individuals in Virginia's coalfield region; therefore, the Commission could not "consider" these groups. The Commission and Sycamore argue that the plain language of the VCEA only requires the Commission to "consider" the benefits to each identified group, not make specific findings related to each group. They contend that the record supported the Commission's decision because the evidence indicated that the Project would benefit local workers and veterans, the Project site is not located in a historically economically disadvantaged area, and the Counties are not located in the coalfield region.

As previously stated, Enactment Clause 7 of the VCEA provides:

> That it shall be the policy of the Commonwealth that the State Corporation Commission . . . in the development of energy programs, job training programs, and placement of renewable energy facilities, shall consider whether and how those facilities and programs benefit local workers, historically economically disadvantaged communities . . . veterans, and individuals in the Virginia coalfield region that are located near previously and presently permitted fossil fuel facilities or coal mines.

2020 Va. Acts chs. 1193, 1194.[5]

The Court's primary objective when construing a statute is "to ascertain and give effect to legislative intent." *Virginia Elec. & Power Co. v. State Corp. Comm'n*, 284 Va. 726, 738 (2012) (citing *Conger v. Barrett*, 280 Va. 627, 630 (2010)). "When the language of the statute is unambiguous, we are bound by the plain meaning of that language." *Id.* (quoting *Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007)). In interpreting a statute, the Court does not single out a particular phrase, but rather places its terms in the context of the entire statute. *Id.*

---

[5] Code § 56-576 defines "historically economically disadvantaged community" as "(i) a community in which a majority of the population are people of color or (ii) a low-income geographic area."

6

"Consider" means "to reflect on: think about with a degree of care or caution." Webster's Third New International Dictionary 483 (1993). Thus, Enactment Clause 7 merely requires the Commission to "reflect on" how the solar facility at issue would impact the four specified groups. *See Campbell v. Dep't of Forestry*, 46 Va. App. 91, 103 (2005) ("A statutory command to consider decisionmaking factors does not mean the factfinder must assign 'measurable weight in the decisional process' to each factor or somehow quantify its impact on the final decision. . . . It means merely the factfinder 'cannot deem legally insignificant' what the statute 'declares to be significant.'") (quoting *Owens v. Owens*, 41 Va. App. 844, 860 (2003)). Nothing in the statutory scheme requires a particular showing or evidentiary presentation. The statute leaves it within the discretion of the Commission to weigh all of the statutory factors against one another to determine whether or not to approve the pending project. Finally, nothing in the plain language of the statute requires the Commission to make specific written findings about each group.

The WVALDC's position would require the Court to add language to the statute that the General Assembly did not see fit to include. "We presume that the legislature chose, with care, the specific words of the statute and that [t]he act of choosing carefully some words necessarily implies that others are omitted with equal care." *Va. Elec. & Power Co. v. State Corp. Comm'n*, 300 Va. 153, 163 (2021) (citing *Wal-Mart Stores East, LP v. State Corp. Comm'n*, 299 Va. 57, 70 (2020) (internal quotation marks omitted)). Indeed, the General Assembly knows how to require the Commission to make express findings or do more than simply "consider" specified criteria. For example, in Code § 56-46.1(A), the General Assembly has required the Commission, in approving any electrical utility facility, to "give consideration to the effect of that facility on the environment and establish such conditions as may be desirable or necessary to minimize adverse environmental impact." Relatedly, the General Assembly has expressly

required the Commission to make findings regarding Current Return increases in rate proceedings. Code § 56-585.1(A)(2)(d). Similar language is notably absent in Enactment Clause 7 of the VCEA; therefore, it is reasonable to conclude that the General Assembly did not intend for the Commission to make specific findings or otherwise act upon its consideration of the delineated groups. *See, e.g.*, *Morgan v. Commonwealth*, 301 Va. 476, 482 (2022) (explaining that "when the General Assembly has used specific language in one instance but omits that language or uses different language when addressing a similar subject elsewhere in the Code, the Court must presume that the difference in the choice of language was intentional," and observing that Virginia's courts "must rely on this presumption because under these circumstances, it is evident that the General Assembly 'knows how' to include such language in a statute to achieve an intended objective, and therefore, omission of such language in another statute represents an unambiguous manifestation of a contrary intention") (cleaned up) (citations omitted).

The Commission complied with the plain language of the statute. In its order on reconsideration, the Commission expressly stated that it "considered the evidence in the record . . . on whether and how the Project benefits the individuals and communities identified in Enactment Clause 7 of the VCEA[.]" The Commission also stated that it considered the Hearing Examiner's report, and specifically cited pages 25-28. These pages include a discussion of the job and labor projections contained in the Mangum Report, Creswell's testimony regarding Sycamore's intention to "make reasonable efforts to use local hiring" and its resistance to imposing a local hiring condition, and evidence that "the Project area is not designated as a historically economically disadvantaged community." The record also established that the Project would be located in Surry and Isle of Wight Counties, which are not located in the coalfield region. Therefore, the Commission could reasonably infer that the Project would have

8

little impact on individuals in the coalfield region. Although Sycamore did not present *specific* evidence about how the Project would benefit veterans, Creswell's testimony can be read broadly to include economic benefits to veterans:

> Q: Do you have any information for the Commission to consider whether, and if, how so, the proposed facilities would "benefit local workers. . . , veterans, and individuals in the Virginia coalfield region that are located near previously or presently permitted fossil fuel facilities or coal mines" as referenced in Enactment Clause 7 of 2020 Va. Acts ch. 1193?
>
> A: This project will provide an estimated 197 jobs during construction, most of whom will be hired locally, and seven (7) full-time jobs for the 35-year operational life of the Project. This equates to approximately $0.6 million in associated labor income and $1.6 million in economic output annually.

In the context of the specific question asked, Creswell's testimony could be understood to indicate that veterans would benefit from the labor income and annual economic output of the Project.[6]

The lack of presentation of specific evidence does not indicate that the Commission did not consider a specific group. Moreover, even if the Commission had not reiterated that it considered the relevant groups, the Commission's decision comes to us with a presumption of correctness. *See Board of Supervisors v. State Corp. Comm'n*, 292 Va. 444, 452 (2016). Accordingly, "'[w]e will not substitute our judgment in matters within the province of the Commission and will not overrule the Commission's findings of fact unless they are contrary to the evidence or without evidentiary support.'" *Id.* (quoting *Level 3 Communications of Va., Inc. v. State Corp. Comm'n*, 268 Va. 471, 474 (2004)). Furthermore, while we review issues of law de novo, "'we will not disturb the Commission's analysis when it is based upon the application

---

[6] We caution, however, that the better practice might be to address each enumerated group individually. A general reference to local hiring or general economic output should not become a catch-all phrase to suggest that the project under review will benefit all of the enumerated groups in the VCEA.

of correct principles of law.'" *Id.* (quoting *Appalachian Voices v. State Corp. Comm'n*, 277 Va. 509, 516 (2009)).

Because the Commission stated that it "considered" the relevant groups and cited to evidence in the record regarding those groups, the Commission complied with the VCEA.

## B. Local Hiring Condition

Next, the WVALDC argues that the Commission abused its discretion because it declined to include a local hiring condition in the CPCN and did not adequately explain its departure from the Commonwealth's policy to create opportunities for local workers. The Commission and Sycamore argue that the Commission appropriately exercised its discretion.

In approving the construction of electrical utility facilities, the Commission is required to "consider the effect of the proposed facility on economic development within the Commonwealth, including but not limited to [the] furtherance of the economic and job creation objectives of the [CCEP] set forth in § 45.2-1706.1." Code § 56-46.1. The CCEP states, in relevant part, that it is the policy of the Commonwealth to "create training opportunities and green career pathways for local workers and workers in historically economically disadvantaged communities in . . . solar energy." Code § 45.2-1706.1(C)(8). The CCEP further provides that when the Commission takes "discretionary action with regard to energy issues, [it] shall recognize the elements of the Commonwealth Clean Energy Policy, and, *where appropriate, shall act in a manner consistent therewith*." Code § 45.2-1706.1(E) (emphasis added). Additionally, as previously stated, Enactment Clause 7 of the VCEA requires the Commission to "consider whether and how those [renewable energy] facilities and programs benefit local workers, historically economically disadvantaged communities . . . veterans, and individuals in the Virginia coalfield region" 2020 Va. Acts chs. 1193, 1194.

10

As an initial matter, the plain language of the CCEP and VCEA does not mandate the use of local workers in solar projects or require the Commission to consider or adopt a hiring plan for local workers. Again, "we presume that the legislature chose, with care, the specific words of the statute and that [t]he act of choosing carefully some words necessarily implies that others are omitted with equal care." *See Va. Elec. & Power Co.,* 300 Va. at 163 (citing *Wal-Mart Stores East,* 299 Va. at 70 (internal quotation marks omitted)). Had the General Assembly intended for the Commission to consider or adopt a local hiring plan, it would have included such language in the statute. For example, when addressing offshore wind projects, the General Assembly specifically directed utility companies to "develop and submit a plan to the Commission for review that includes. . . (i) options for utilizing local workers. . . [and] (iv) giving priority to the hiring, apprenticeship, and training of veterans. . . local workers, and workers from historically economically disadvantaged communities." Code § 56-585.1:11(D).

"We . . . presume that where the General Assembly has not placed an express limitation in a statutory grant of authority, it intended for the Commission, as an expert body, to exercise sound discretion." *City of Alexandria v. State Corp. Comm'n*, 296 Va. 79, 94 (2018) (quoting *Virginia Elec. & Power Co.*, 284 Va. at 741). A tribunal "abuses its discretion 'when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; [or] when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." *Murry v. Commonwealth*, 288 Va. 117, 122 (2014) (quoting *Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011) (alteration in original)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Du v. Commonwealth*, 292 Va. 555, 564 (2016).

The Commission expressly stated that it considered the evidence regarding the enumerated groups in Enactment Clause 7 of the VCEA and the job creation objectives in the CCEP, then exercised its discretion to not impose a hiring-related condition. Contrary to the WVALDC's assertion, the Commission explained the rationale for its decision. First, the Commission observed that there was no statutory requirement or Commission precedent for imposing a hiring-related condition, including the Hearing Examiner's proposed notification requirement. Second, the Commission "found reasonable and credible" the local hiring assumptions in the Mangum Report and "the Company's commitment to use reasonable efforts to use local hiring." Third, the Commission credited Creswell's testimony regarding the difficulty in imposing a specific hiring requirement because hiring would not begin for at least a year and the "workforce and other circumstances may have changed by then."

In support of its argument, the WVALDC relies heavily on the fact that the Hearing Officer proposed a notification requirement. However, even if the Hearing Examiner's proposed notification requirement was reasonable, feasible, and consistent with the policy objectives in the CCEP, the Commission ultimately had the discretion to choose whether or not to impose any hiring-related conditions. *See City of Alexandria*, 296 Va. at 94. The Commission reasonably concluded that, based on the evidence, the reasons stated and lack of precedent, it was not appropriate to impose a hiring-related condition in this case. *See* Code § 45.2-1706.1(E). Under this highly deferential standard, the Commission did not abuse its discretion.

### III. CONCLUSION

For the reasons stated herein, we affirm the judgment of the Commission.

*Affirmed.*

12