COURT OF APPEALS OF VIRGINIA

Present:   Judges Kelsey, Alston and Senior Judge Bumgardner
Argued at Alexandria, Virginia


BRODRICK C. ARATOON

MEMORANDUM OPINION[*] BY
v.     Record No.  0529-14-4                              JUDGE D. ARTHUR KELSEY
                                                                       JANUARY 27, 2015

CHERYL ROBERTS


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Lorraine Nordlund, Judge


Ted Kavrukov (Law Office of Ted Kavrukov, LLC,
on briefs), for appellant.

Ronald L. Hiss for appellee.


At the request of Cheryl Roberts, the trial court reduced and ultimately terminated her

court-ordered obligation to pay spousal support to her former husband, Brodrick C. Aratoon.

The court also held Aratoon's counsel in contempt of court and ordered that he pay the fee

retainer for a guardian *ad litem* appointed *sua sponte* by the court.  We affirm the court's

decision to terminate spousal support but reverse the court's finding of contempt and its order

appointing a guardian *ad litem*.

I.

On appeal, "we view the evidence in the light most favorable to the prevailing party,"

granting him or her "the benefit of any reasonable inferences."  Hamad v. Hamad, 61 Va. App.

593, 596, 739 S.E.2d 232, 234 (2013) (quoting White v. White, 56 Va. App. 214, 216, 692

S.E.2d 289, 290 (2010)).  "That principle requires us to discard the evidence of the appellant

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

which conflicts, either directly or inferentially, with the evidence presented by the appellee at trial." Id. (quoting Owens v. Owens, 41 Va. App. 844, 848-49, 589 S.E.2d 488, 491 (2003)).

In 2007, the trial court entered a final decree divorcing Aratoon and Roberts. The decree directed Roberts to pay $7,000 a month in spousal support to Aratoon. Two years later, the court reduced the award to $5,000 a month. In 2012, Roberts filed a petition to reduce or to terminate her spousal support obligation. She alleged that she had lost her job and had tried unsuccessfully to obtain new employment. She also stated that she alone had taken on the responsibility of paying for their adult son's college education, as she had for their older daughter.

Roberts further alleged that Aratoon had "squandered large sums of cash derived from the proceeds of the divorce in 2007," including $400,000 from the sale of the marital residence and $84,000 awarded to him from the dissolved marital accounts. App. at 2. In addition, Roberts asserted, Aratoon had "never attempted any meaningful employment since the divorce." Id. In reply, Aratoon denied all of his former wife's allegations and requested that the existing $5,000 spousal support award remain intact.

The trial court held four evidentiary hearings in an effort to resolve the dispute. At one of those hearings, the court concluded that Aratoon's counsel had failed to comply with the court's request to investigate Aratoon's eligibility for Social Security disability benefits or other public assistance and held Aratoon's counsel in contempt. The court *sua sponte* appointed a guardian *ad litem* to conduct the investigation and to report her findings to the court. Id. at 106.[1] As punishment for the finding of contempt, the court ordered Aratoon's counsel to pay the guardian

---

[1] During the discussion of the guardian *ad litem's* appointment, Roberts's counsel suggested that the court appoint a conservator rather than a guardian *ad litem*, to which the trial court responded, "Well, the problem is[,] I have to go through a process to get a conservator, and that's going to take too much time. I can do a guardian ad litem today." App. at 178.

*ad litem's* $3,000 fee retainer.  Id. at 104, 106.  The order waived endorsement of counsel on the apparent assumption that the order addressed an "uncontested matter."  Id. at 107.  Upon receiving the order, however, Aratoon's counsel promptly filed written objections.

After hearing testimony from the parties and their witnesses, the court found that changed circumstances warranted initially reducing the monthly support to $2,000 and terminating it altogether approximately six months later, on August 31, 2014.  The court's order contained written findings of fact, including the following:

- Aratoon received a $614,000 monetary award, as well as large monthly spousal support payments from the final divorce decree, "such that in the seven years since their divorce he has received about $1.1 million dollars."  Id. at 8.

- Aratoon "did not make good use of the funds given to him and now expects [Roberts] to support his poor choices."  Id.

- "[C]redible evidence" showed that Aratoon had told Roberts that "he intend[ed] to bankrupt" her.  Id.

- Aratoon displayed a "measure of contrivance with respect to false attempts to pursue" any public benefits potentially available to him.  Id.  In particular, Aratoon "failed to properly respond to requests regarding benefits or in some other manner chose not to pursue or obtain the available benefits from the Federal and State Governments."  Id.

- Roberts had taken on the sole responsibility to pay for the college educations of their two children, despite their earlier "mutual acknowledged obligation" to share the expenses.  Id.

- Roberts was in "dire financial circumstances," despite the prudent handling of her finances, but Aratoon had "squandered" his assets.  Id. at 9.

- The support obligation had drained Roberts's finances to the point that she was incapable of providing for her retirement.  Id.

- Roberts obtained employment but had incurred a "significant reduction in her income."  Id.  Her "earning capacity" was "tapped out."  Id.

- Aratoon suffered from some "mental condition, the source of which is really not clear" but appeared to be related to depression. Id.

- Aratoon had made "significant negative contributions to the well-being of the family since this divorce, both through his criminal conduct" and his "manic" behavior. Id.

- Roberts had "steadfastly done her best to save a sinking ship, and has made significant contributions to the well-being of the family, even post-divorce." Id.

- Aratoon's "own evidence" showed that "he is able to work" and that he was "not disabled and not incapable of work." Id. And, "even if" the court were to conclude that he was disabled, and "look at the benefits, not his work," Aratoon failed to make a good-faith effort at obtaining Social Security disability benefits or any other available public assistance. Id.

- Additional "equity" considerations, the trial court added, informed its judgment pursuant to the catch-all factor of Code § 20-107(E). Id. at 10.

Aratoon asserted numerous objections to the trial court's order and filed an unsuccessful motion for reconsideration.

## II.

On appeal, Aratoon asserts several compound assignments of error. For clarity, we will reorganize these assertions, combining some while separating others.

### A. FACTORS RELEVANT TO THE COURT'S DECISION

Aratoon's first two assignments of error claim that the trial court failed to rely on an important decisional factor (his prior standard of living during the marriage) and improperly relied on other, legally irrelevant or factually insupportable factors (his failure to seek disability benefits, as well as other public entitlements, and his squandering of funds after the entry of the divorce decree). For several reasons, we find no such errors embedded in the trial court's decision to terminate Aratoon's spousal support.

- 4 -

Code § 20-109(A) authorizes a trial court to "increase, decrease, or terminate the amount or duration of any spousal support and maintenance that may thereafter accrue, whether previously or hereafter awarded, as the circumstances may make proper." Unlike so many topics in domestic relations law,[2] the Code does not list decisional factors governing the modification or termination of spousal support. The Code withdraws discretion only in certain cases of habitual cohabitation, remarriage, and death. See Code § 20-109(A), (D). In those cases, the trial court *must* terminate support. In all other cases, however, the court *may* reduce or terminate support when, exercising prudent discretion, "the circumstances may make [doing so] proper." Code § 20-109(A).

In making this highly discretionary decision, a trial court may begin its analysis by consulting the statutory factors in Code § 20-107.1(E) that guided the initial decision to grant or to deny spousal support in an effort to determine if a "change in circumstances" exists. Barton v. Barton, 31 Va. App. 175, 177, 522 S.E.2d 373, 374 (1999). The court should then determine if these changes, when viewed in their totality, warrant a modification or termination of support. See Street v. Street, 25 Va. App. 380, 386, 488 S.E.2d 665, 668 (1997) (*en banc*); Reece v. Reece, 22 Va. App. 368, 373, 470 S.E.2d 148, 151 (1996).

We can only find an abuse of discretion when it can be truly said that "reasonable jurists" could not disagree as to the proper decision. Brandau v. Brandau, 52 Va. App. 632, 641, 666 S.E.2d 532, 537 (2008) (internal quotation marks omitted). This deferential standard of review "necessarily implies that, for some decisions, conscientious jurists could reach different conclusions based on exactly the same facts — yet still remain entirely reasonable." Hamad, 61

---

[2] See, e.g., Code § 20-107.1(E) (initial spousal support, defined or permanent duration), Code § 20-107.3(E) (equitable distribution), Code § 20-108.1(B) (child support), Code § 20-124.3 (child custody and visitation).

Va. App. at 607, 739 S.E.2d at 239. The trial court "has a range of choice, and its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." Lawlor v. Commonwealth, 285 Va. 187, 212-13, 738 S.E.2d 847, 861 (2013) (alteration and internal quotation marks omitted). We apply this "bell-shaped curve of reasonability" based on our "venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." Hamad, 61 Va. App. at 607, 739 S.E.2d at 239.

In this case, the trial court reviewed the factors involved in the initial support decision and considered the circumstances affecting those factors from the time of the support award until the petition for modification. The court's evaluation of the evidence was thorough and meticulous. We find in the evidentiary record ample grounds for the trial court to conclude that Aratoon, among other things, had squandered his considerable assets, viewed his own efforts to obtain spousal support as a means to bankrupt Roberts, and failed to mitigate his economic need by using due diligence either to obtain employment that could accommodate his alleged disability or, alternatively, to seek Social Security disability benefits and other available public assistance.

The record also confirms that Roberts had lost her job and thereafter found new employment at a much reduced salary. The continuing spousal support obligation, the trial court reasonably found, had placed Roberts in a precarious economic position. When viewed together, these and other circumstances in the record support the trial court's decision initially to reduce and ultimately to terminate Roberts's obligation to support her former husband.

It is true, as Aratoon argues, that an abuse of discretion necessarily occurs when a discretionary decision expressly relies on a legally impermissible factor. He claims that the trial court did just that when it considered whether Aratoon had exercised due diligence to determine

if he could obtain Social Security disability benefits or other available public assistance due to his alleged disabilities. We disagree.

The trial court found that Aratoon's "own evidence" showed that "he is able to work" and that he is "not disabled and not incapable of work." App. at 9.[3] In the alternative, the court observed, "even if" Aratoon were truly disabled, he failed to make a good faith effort to obtain Social Security disability benefits and other available public assistance. Id.[4] Thus, in context, the court's "even if" comments do not implicate the exaggerated concerns raised by Aratoon on appeal.[5] Nor do they imply that the court had debited in any way the calculation of Aratoon's financial needs by the amount of any unclaimed public benefits.

---

[3] Aratoon claims that the trial court, sitting as factfinder, abused its discretion by rejecting Aratoon's "uncontradicted and unimpeached expert testimony," which allegedly proved that he was disabled and, thus, had no earning capacity. Appellant's Br. at 37. As noted by the court, however, Roberts's expert testified that Aratoon had residual, unrealized earning capacity. Equally inconsistent with Aratoon's argument was the document that he submitted for the court's consideration, which stated that the Social Security Administration (SSA) denied his claim for disability benefits because his "condition was not disabling on any date through 12/31/2010, when [Aratoon was] last insured for disability benefits." R. at 1030-32. Subsequent to Aratoon's presentation of his expert testimony, the court explained at a later hearing that "additional evidence" had been submitted by Aratoon himself that contained a contradictory finding from the SSA as to Aratoon's alleged disability. Hr'g Tr. (Jan. 16, 2014) at 87; see also id. at 98-99.

[4] The trial court found "that there has been some measure of contrivance with respect to false attempts to pursue any benefits." Id. at 97-98. The SSA letter denying disability benefits was dated July 18, 2013, with a sixty-day window from the date of the notice to appeal. See R. at 1030-32. Applications were also submitted by Aratoon for medical assistance and food stamps, which were also denied. The denial letter for medical assistance was dated May 23, 2013, with the provision that missing verifications could be provided until September 30, 2013. Id. at 1022-24. The denial letter for food stamps was dated July 9, 2013, which provided a ninety-day window from the date of the notice to request a hearing to appeal the decision. Id. at 1020-21. Aratoon submitted each of these denial letters for the court's consideration on October 10, 2013, id. at 1019, three days after the final window had expired to appeal any of the requested benefits.

[5] "Neither, § 20-107.1, nor any Virginia law, authorizes a trial judge to coerce a litigant to take social security benefits at age 62 by eliminating the litigant's spousal support at or near the litigant's 62nd birthday." Appellant's Br. at 18.

We similarly find no fault with the factual basis for the trial court's alleged refusal to consider Aratoon's prior standard of living during the marriage or the court's finding that he squandered his funds following the divorce.

Concerning the former, the trial court expressly addressed the parties' prior standard of living. The earlier marital standard of living had been overtaken by events, the court observed, because "neither party is able to live according to that standard at this time," and thus, the court "must look at their present circumstances." Id. at 39. We agree with this reasoning.

Virginia law seeks to place an innocent payee spouse in roughly the same position (with respect to his or her standard of living) as he or she enjoyed prior to the divorce. See Brandau, 52 Va. App. at 637, 666 S.E.2d at 535. But that principle does not mean that a court addressing a later petition for modification cannot consider post-divorce events that would have affected the parties' standard of living had they never been divorced. See generally Blank v. Blank, 10 Va. App. 1, 4, 389 S.E.2d 723, 724 (1990); see also Jacobs v. Jacobs, 219 Va. 993, 995, 254 S.E.2d 56, 58 (1979); Rogers v. Rogers, 51 Va. App. 261, 270, 656 S.E.2d 436, 440 (2008).

Regarding the question whether Aratoon squandered funds, he claims no evidence proved "that he wasted money on expensive jewelry, cars, vacations, women, alcohol, gambling, speculated on real estate or the stock market, was involved in dubious business ventures, or anything else that is considered profligate." Appellant's Br. at 25. Perhaps so. But the trial court never asserted that he did any of those things. Instead, the court merely noted that Aratoon received a $614,000 monetary award, as well as large monthly spousal support payments from the final divorce decree, "such that in the seven years since their divorce he has received about $1.1 million dollars." App. at 8. And, yet, at the time of the evidentiary hearing, Aratoon was living in a hotel room and claiming to be insolvent. The trial court's observation that over a

million dollars had vanished, with nothing to show for it, was a reasonable basis for inferring that the money had been squandered. Although Aratoon offered various exculpatory explanations, the trial court found them to be self-serving and unpersuasive.[6]

### B. ALLOWING ROBERTS'S EXPERT TO TESTIFY

Aratoon also argues the trial court erred when it denied his objection to the testimony of Dr. Ryan Shugarman, an expert witness retained by Roberts. Under the unique circumstances of this case, we disagree.

In pretrial discovery, Aratoon's counsel asked Roberts to disclose the identity of any testifying experts and the substance of their opinions. At the final evidentiary hearing, conducted on April 22, 2013, Roberts called to the stand an expert witness (Dr. Ryan Shugarman) who had been identified in discovery as an expert addressing the general subject of "forensic psychology." Id. at 154. No specific opinions were disclosed. Over Aratoon's objection, the trial court allowed the expert to testify. The court held that the expert offered testimony "in rebuttal, rather than in direct," id. at 156, and that Aratoon's counsel had learned enough information from an earlier evidentiary hearing to adequately prepare to cross-examine the expert.

---

[6] On brief, Aratoon asserts that the doctrines of *res judicata* and collateral estoppel precluded the trial court from addressing whether he had squandered his assets. See Appellant's Br. at 27-28; but see Supp'l App. at 3; R. at 739-45 (the court, in an earlier proceeding post-divorce, stated that "an awful lot of money has been squandered"). Aratoon contends the squandering issue was "litigated during the divorce." Id. at 26. The trial court summarily rejected the argument, as do we. Neither preclusion doctrine applies to factual events wholly occurring *after* the alleged predicate judicial finding. See Restatement (Second) of Judgments § 24 cmt. f ("Material operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first."); see also id. § 13 cmt. c ("The res judicata consequences of such judgments follow normal lines while circumstances remain constant, but those consequences may be affected when a material change of the circumstances occurs after the judgment.").

We accept *arguendo* the trial court's characterization of this expert as a rebuttal witness. Standing alone, that observation would not necessarily excuse a party from identifying such an expert in response to pending discovery requests. Under the unique circumstances of this case, however, the court had the discretion to allow the expert to testify. Aratoon's counsel never proffered to the trial court any prejudice for the untimely disclosure — such as an excusable inability to adequately question the witness, the injection of a surprise issue not raised elsewhere in the evidence, or the need to call additional experts to counter the unexpected testimony. The absence of any prejudice, coupled with the fractured nature of the evidentiary hearings, protects the court's decision from being deemed on appeal to be an abuse of discretion.

## C. RELIANCE ON AN UNPUBLISHED APPELLATE OPINION

Aratoon contends that we should vacate the trial court's judgment because the court found the reasoning of one of our unpublished opinions to be "very sound." Appellant's Br. at 37 (quoting App. at 22). The memorandum opinion, Smith v. Smith, No. 1709-11-2, 2012 Va. App. LEXIS 148 (Va. Ct. App. May 8, 2012), addressed an appellate challenge to a trial court decision to modify spousal support. Aratoon claims that the trial court, when it considered Smith, violated "well-settled principles of legal research and allow[ed] for an uneven playing field" and thereby acted in a manner "unfair and patently prejudicial" to Aratoon. Appellant's Br. at 38.

Suffice it to say, we too thought Smith was "very sound," or we would not have issued it. A trial court can hardly be faulted for coming to the same conclusion. "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." Otey v. Commonwealth, 61 Va. App. 346, 351, 735 S.E.2d 255, 258 (2012) (citing Rule 5A:1(f)). That does not mean, however, that the unpublished opinion was binding on the trial court or, for that

matter, on another panel of our Court. Either could respectfully disagree with the reasoning or the holding of one of our unpublished appellate opinions. Aratoon was free to argue in the trial court that <u>Smith</u> was wrongly decided, and, of course, he may likewise do so in this appeal.

Instead, Aratoon appears to suggest that the trial court committed some type of structural error by adopting the reasoning of an unpublished opinion that he does not challenge as erroneous. This circular argument collapses under its own weight. The issue on appeal is whether the trial court's decision was erroneous. If it was, it would not matter that the trial court relied on a non-binding, unpublished appellate opinion. On the other hand, if the trial court's decision was correct, then *a fortiori*, it would not matter that the court based its correct decision on an (equally correct) unpublished appellate opinion. The only relevant debate on appeal is whether, not why, the trial court erred.

### D. FINDING OF CONTEMPT AND IMPOSITION OF GUARDIAN *AD LITEM* FEES

During one of the evidentiary hearings in this case, the trial court asked both counsel to "find out" exactly what disability benefits and public assistance might be available to Aratoon if, in fact, he is truly disabled. App. at 136; <u>see</u> <u>also</u> Supp'l App. at 19. The court added: "Find out the information, stipulate to it, and have it ready to present. Is that clear?" App. at 136. The court did not enter any written order further clarifying its request.

At a later hearing, the court concluded that Aratoon's counsel had not adequately complied with the court's request. After *sua sponte* deciding to appoint a guardian *ad litem* to conduct the requested investigation, the court advised Aratoon's counsel:

> I find that you are in contempt by failing to follow through with the court's order. So the money is going to come from you as the sanction. You're going to pay for the guardian ad litem, because the guardian ad litem is going to be doing the work that you should have been doing since this court's order.

Id. at 178. Later written orders of the court expressly found Aratoon's counsel in contempt and directed him to pay a $3,000 fee retainer to the guardian *ad litem*.

On this subject, the trial court erred. Outside the context of court-supervised pretrial discovery, it is highly questionable whether the court has any inherent authority to order a party's counsel to produce evidence at an evidentiary hearing that counsel believes might prejudice his client.[7] It is all the more doubtful that a court may order a party's counsel to stipulate to such facts. We need not go into these concerns further because a more basic flaw undermines the trial court's finding of contempt.

A contempt finding can be based upon a wilful violation of an "oral pronouncement from the bench." Amos v. Commonwealth, 61 Va. App. 730, 739, 740 S.E.2d 43, 48 (2013) (*en banc*), aff'd, 287 Va. 301, 754 S.E.2d 304 (2014). Even so, the oral pronouncement must be in the nature of a clear, coercive judicial order — one that allows no reasonable doubt as to whether, how, and why it must be obeyed. A mere judicial request, even when strongly worded, is insufficient because "a duty that arises by implication cannot sustain a finding of contempt." Petrosinelli v. People for the Ethical Treatment of Animals, Inc., 273 Va. 700, 709, 643 S.E.2d 151, 156 (2007) (citing Winn v. Winn, 218 Va. 8, 10-11, 235 S.E.2d 307, 309 (1977)).

---

[7] It concerns us that the duty of Aratoon's counsel to represent his client zealously arguably conflicted with his ability to provide the court with what it sought. See generally Greenlaw v. United States, 554 U.S. 237, 243 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."); United States v. Castro, 540 U.S. 375, 386 (2003) (Scalia, J., concurring) (acknowledging that the adversarial system "is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief"); Bunn v. Oldendorff Carriers GmbH & Co. KG, 723 F.3d 454, 466 (4th Cir. 2013) ("[T]he parties to a lawsuit are entitled to frame the issues as each deems best.").

For good reason, we recognize that the "judicial contempt power is a potent weapon." Id. at 706, 643 S.E.2d at 154 (quoting Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n, 389 U.S. 64, 76 (1967)).  Before one can be held in contempt for violating a court order, "the order must be in definite terms as to the duties thereby imposed upon him and the command must be expressed rather than implied."  Shebelskie v. Brown, 287 Va. 18, 30, 752 S.E.2d 877, 884 (2014) (quoting  Petrosinelli, 273 Va. at 707, 643 S.E.2d at 154); see also DRHI, Inc. v. Hanback, ___ Va. ___, ___, 765 S.E.2d 9, 13 (2014); Winn, 218 Va. at 10, 235 S.E.2d at 309; French v. Pobst, 203 Va. 704, 710, 127 S.E.2d 137, 141 (1962).

In this case, the duty of compliance "was, at best, an implication from general remarks of the court made in prior hearings."  Petrosinelli, 273 Va. at 709, 643 S.E.2d at 156.  It was not an oral order from the bench stated in "definite terms" as a direct command, id. at 707, 643 S.E.2d at 154, but rather a request, albeit an emphatic one, stated in indefinite terms.  For this reason, we agree with Aratoon that the trial court erred in finding his counsel in contempt of court and ordering, as punishment for the contempt,[8] that counsel pay the $3,000 retainer fee to the guardian *ad litem*.

### E. APPOINTMENT OF GUARDIAN *AD LITEM*

Finally, Aratoon challenges on appeal the trial court's *sua sponte* appointment of a guardian *ad litem*.  The circumstances of this case, he contends, did not warrant the appointment of a guardian *ad litem*.  We agree.

Guardians *ad litem* serve an important role in the judicial process.  Various statutes provide for their appointment and define the role they serve.  Among other duties, they protect

---

[8] Given our holding, we need not address the distinctions between criminal and civil contempt, see UMWA v. Bagwell, 512 U.S. 821 (1994), or between summary and plenary contempt, see Parham v. Commonwealth, 60 Va. App. 450, 729 S.E.2d 734 (2012).

the interests of children,[9] adults suffering from mental illness,[10] and persons under disability.[11] In this case, the trial court appointed a guardian *ad litem* (i) to investigate whether Aratoon qualified for disability benefits or other available public assistance, and (ii) to present evidence and recommendations on this subject — that is, to accomplish what Aratoon's counsel was requested to do and was improperly held in contempt for not doing. See Supp'l App. at 18-19.

The only possible statutory basis for the appointment of the guardian *ad litem* required the court to find that Aratoon was "otherwise unable to defend his property or legal rights either because of age or temporary or permanent impairment, whether physical, mental, or both," Code § 8.01-2(6)(e)(iii), and that "the interests of justice" requirement the appointment even though Aratoon was represented by counsel, Code § 8.01-9(B).[12] Given the inconclusive evidence of Aratoon's alleged disability, if any, and the stated reason for which the trial court appointed the guardian *ad litem*, we hold the circumstances failed to satisfy the statutory predicates for appointing a guardian *ad litem* under Code §§ 8.01-2(6)(e) and 8.01-9(B). Because no statutory basis exists for the appointment of a guardian *ad litem* for the stated purpose, the trial court erred in doing so.[13]

---

[9] Code § 16.1-266 (parental rights termination); Code §§ 16.1-339, -345.4 (psychiatric treatment of minors); Code § 16.1-350 (standby guardianship); Code § 20-49.2 (parentage proceedings); Code § 20-124.2 (custody and visitation proceedings); Code § 20-160 (surrogacy contract approval proceedings); Code § 63.2-1220.4 (post-adoption contact agreement).

[10] Code § 20-91 (divorce proceedings); Code § 64.2-2003 (generally).

[11] Code § 8.01-9 (generally); Code § 8.01-73 (disposition of real estate); Code § 25.1-215 (condemnation proceedings); Code § 58.1-3967 (delinquent tax lands sale proceedings); Code § 64.2-449 (probate proceedings); Code § 64.2-713 (trust proceedings).

[12] In the trial court proceedings, Aratoon did not assert that evidence presented by the guardian *ad litem* should have been disregarded by the trial court based upon his challenge to her appointment. Nor does he make that claim on appeal. We thus express no opinion on this issue.

[13] Because neither the trial court nor the parties have addressed the issue, we do not decide whether the court would have had the non-statutory, inherent authority to appoint a special master or commissioner to conduct the requested investigation and to make factual

III.

In sum, we affirm the trial court's decision to terminate spousal support but reverse the

trial court's finding of contempt and its order appointing a guardian *ad litem*.[14]

Affirmed in part, reversed in part.

findings on the subject. Historically, chancery courts in Virginia had the power to "appoint a master or commissioner with specific duties, including, "[t]o make [i]nquiries" that are "directed either to persons or to facts." Kraker v. Shields, 61 Va. (20 Gratt.) 377, 391-92 (1871) (quoting 2 Edmund Robert Daniell et al., Pleading and Practice of the High Court of Chancery 1399 (1st Am. ed. 1846)). See generally Raiford v. Raiford, 193 Va. 221, 227, 68 S.E.2d 888, 892 (1952) (noting that "[t]here are so many cases in which a reference to a commissioner is necessary," including "the more effectual working out of details which the judge sitting in court is unable to investigate, or to make some specific inquiry necessary to satisfy the conscience of the chancellor" (internal quotation marks omitted)); 1 Oliver Lorenzo Barbour, A Treatise on the Practice of the Court of Chancery 468 (1st ed. 1843) ("The duties of masters are various, and difficult to be specified; for there is no question of law or equity or disputed fact or facts, which a master may not have occasion to decide upon, or respecting which he may not be called upon to report his opinion to the court.").

"Commissioners in chancery may be appointed in cases in circuit court" upon "agreement by the parties with the concurrence of the court," or "[u]pon (i) motion of a party, or (ii) upon motion of the court, sua sponte" when the court makes "a finding of good cause." Code § 8.01-607(B); see also Rule 3:23. "The use of commissioners in chancery has been of long standing in Virginia," Klein v. Klein, 11 Va. App. 155, 159, 396 S.E.2d 866, 869 (1990), and commissioners "have been appointed in almost any case in equity, including divorce and other proceedings that follow equity practice," John L. Costello, Virginia Remedies § 8.02 (4th ed. 2011).

[14] Both parties seek an award of attorney fees on appeal. We award appellate fees only in the unusual case when the arguments on appeal are "not fairly debatable under any reasonable construction of the record or the governing legal principles. We have no reluctance imposing fees in such circumstances." Brandau, 52 Va. App. at 642, 666 S.E.2d at 538. Applying this standard, we deny both parties' respective requests for appellate fees.