COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Russell, Malveaux and Athey
Argued by videoconference


SHAWN GAINES

MEMORANDUM OPINION[*] BY
v.      Record No. 0885-20-4          JUDGE WESLEY G. RUSSELL, JR.
MARCH 30, 2021

LEONORA GAINES


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Grace Burke Carroll, Judge

Daniel B. Schy (Curran Moher Weis, P.C., on brief), for appellant.

No brief or argument for appellee.


The trial court awarded Leonora Gaines (wife) a divorce from Shawn Gaines (husband).

The final decree provided for equitable distribution of the parties' estate and granted wife spousal

support. On appeal, husband challenges the trial court's apportionment of the marital debt and its

calculation of spousal support. For the reasons that follow, we affirm the judgment of the trial

court.

BACKGROUND

For the purpose of this appeal, wife was the prevailing party in the trial court. "When

reviewing a trial court's decision on appeal, 'we view the evidence in the light most favorable to the

prevailing party, granting it the benefit of any reasonable inferences.'" Brandau v. Brandau, 52

Va. App. 632, 635 (2008) (quoting Smith v. Smith, 43 Va. App. 279, 282 (2004)). Accordingly, we

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

"discard the evidence . . . which conflicts, either directly or inferentially, with the evidence" that favored wife at trial.  Id. (quoting Petry v. Petry, 41 Va. App. 782, 786 (2003)).

So viewed, the evidence establishes that the parties were married in July 1992 and separated in May 2018.  The parties have a son, who was an adult when the divorce proceedings began.

When the parties married, they were living in Guam.  Husband was serving in the United States Air Force and wife was a student, working towards a degree in hotel management.  Wife did not complete her higher education, but she worked full time at a hotel during the first few years of marriage.  When the parties moved to northern California in 1994, the parties agreed that wife would stay home to care for their son, but a few years later she began working part-time.  The parties discussed the possibility of wife completing her education, but they ultimately decided that she would continue to be available to care for the child and that husband would "go first."  Husband completed his undergraduate degree in 2004 after taking out student loans to do so.

The family moved to Virginia in 2005.  Wife engaged in a brief affair, but the parties reconciled.  Wife worked at a call center for a short while, but ultimately found full-time employment as a pre-kindergarten teacher with her current employer, Rainbow Day Care Center.  Husband was able to use the G.I. bill to obtain a master's degree.  The parties lived beyond their means:  they travelled, went to concerts, and made other luxury purchases.

In the summer of 2011, husband retired from the military and started working for the CIA.  The same year, the parties' son enrolled in college, and the parties agreed to pay for his attendance and took out several loans to do so.  The parties continued to live beyond their means, and husband ultimately took out two personal loans to pay off some accrued credit card debt.

In the fall of 2017, husband began an affair with another woman.  In December 2017, he left the marital residence, telling wife that he was "going to a friend's house."  When he returned several days later, he told wife that he did not want to be married anymore and he left again "for three

months." Husband returned temporarily in March 2018. He permanently removed himself in May 2018 and moved in with his now girlfriend. In May 2019, husband and his girlfriend entered into an apartment lease together.

Post-separation, wife continued to deposit her paychecks in the parties' joint account until November 2018. Husband paid the rent and utilities for the marital residence until January 2019; he also made payments on wife's credit cards. Husband consolidated the personal loans and obtained additional funds to pay 2018 taxes.

Wife filed a complaint for divorce in May 2019, and a *pendente lite* order was entered in July 2019. The parties were directed to pay at least the monthly minimums on debts held in their respective names, wife was made responsible for expenses associated with the martial residence, and husband was ordered to pay wife $2,200 monthly spousal support until further order of the trial court.

To expedite proceedings in the trial court, the parties entered into several stipulations regarding their finances. They agreed to the classification, valuation, and distribution of several items of tangible personal property, including vehicles and a dog. They further agreed that husband was receiving $2,217 a month from his military pension, which pension was 93% marital property. Husband also was in possession of a Thrift Savings Plan valued at $191,607, with the marital share valued at $178,421. Wife's employment had resulted in no retirement or pension accounts.

Regarding their respective incomes from employment, the parties stipulated that, at the pertinent time, "[w]ife's monthly gross income from employment with Rainbow Daycare Center is: $2,437.00" and "[h]usband's monthly gross income from employment with the CIA is: $9,311.00." Thus, by stipulation, the parties established that husband earned slightly less than eighty percent of the combined employment income and wife earned slightly more than twenty percent of the combined employment income.

The parties also stipulated to the amounts and sources of their debts. They agreed that they had amassed just over $34,000 in marital credit card debt as of the date of separation. Both parties had acquired additional credit card debt after separation. The stipulation noted the personal loans acquired during the marriage that were consolidated after separation; the parties agreed that there was a balance of $17,654 when the consolidation occurred. As of the date of the separation, a balance of roughly $7,515 was outstanding on husband's student loans while just under $6,080 remained by the date of hearing. When they separated, the parties owed approximately $96,300 on their son's student loans, but that amount had been reduced to $87,210 by the hearing date. Wife also was liable for $9,100 in promissory notes.

The parties additionally agreed that husband and his now girlfriend "live together . . . [and] share the cost of living expenses . . . ." The stipulation, however, did not address how those living expenses were allocated or the amount of the living expenses actually paid by husband.

Several weeks prior to the filing of these stipulations, wife filed a motion for an alternate valuation date. She more specifically moved as follows:

> In light of the pay-down of debt with marital funds during the pendency of the suits, [h]usband's admission of waste and the accumulation of additional debt, [w]ife requests that the debt accounts and accounts from which funds were paid be valued at a date that best represents the marital value of the debt(s) and accounts/funds from which debt(s) were paid for purposes of [e]quitable [d]istribution . . . [and t]hat the [c]ourt determine the appropriate valuation date for each debt or other marital property, asset or interest so designated by this [c]ourt[.]

An *ore tenus* evidentiary hearing was held on October 8 and 9, 2019. At the outset of the trial, wife raised the issue of valuation of the debts. She stated, "[W]ith respect to the school loans, [I] ask[] that those loans be valued at the date of the hearing[,]" using "[t]he current value." Wife explained that "husband has received, during the course of the separation, his military pension . . . that is already in pay status" and that for "the first five or six months of the parties' separation, [she]

was depositing her paycheck into the joint account" and therefore, because husband "had marital funds at his disposal during the separation . . . these marital funds should be credited with the pay down of debt." She further asked that the personal loans be valued as of June 2019, when husband consolidated them and "increased the amount due."

In response, husband argued that the law required that debt be valued as of the date of separation, but that it also authorized the trial court to consider any pay down of debt, and therefore "it does not follow that the [c]ourt needs to use an alternate []valuation date in order to attain the ends of justice." Husband further argued that wife should not get credit for the pay down of marital debt in light of all the support she was receiving post-separation, which support was "based largely on the gross income of the parties, which included the pension income." The trial court took the issue under advisement pending presentation of the evidence; during closing argument, the trial court queried, "[H]ow does the [c]ourt, if I don't use an alternative valuation date, tease out the fact that the husband and the wife's separate property after separation -- i.e., their income, and including the DFAS, including husband's income, including wife's income, was used to pay these expenses?" Husband responded that "the simplest, easiest way is, just take the date of separation, and use that for the valuation of these debts, and credit [him] then for paying down all of these obligations."

The parties testified to various aspects of their marriage, including decisions related to their own and their son's higher educations, husband's active involvement in the son's activities, and the impact of their respective affairs. Wife noted that they always had struggled with management of their finances, even after husband started to use a spreadsheet to track their spending. She acknowledged the financial contributions husband made to her post-separation. Both parties offered evidence of their living expenses. Husband asserted that he paid $600 in rent and that the amount was low "out of the kindness of friends." When questioned regarding his expenses, particularly his high dining and entertainment expenditures, husband explained that, when he first left the marital

residence, "I was living rent free, and I wasn't paying for any of the utilities, I wasn't paying for entertainment or for cable. Someone helped me out in a high-rent area. I wasn't able to afford two addresses at the same time, so I was grateful." He recounted that he paid for things as an "offset" for the generosity he was receiving: "Because I'm not contributing to cable, or any of the -- as far as -- like, food or whatever, so . . . she[, the girlfriend,] was able to give me a lower price because I was willing to cover other bills in other ways, I guess."

Husband testified that, in addition to the stipulated retirement accounts, he was entitled to a FERS pension through the CIA. Husband conceded that he had access to funds from wife's paychecks from May to November 2018 and that payments on husband's student loans were made from the parties' joint account until at least August 2018. Husband described the consolidation of the personal loans and acknowledged his 2018 IRS debt.

Husband's counsel asked both parties whether either anticipated making any changes on their 2019 tax returns from their 2018 returns, particularly with respect to deductions. Neither party anticipated any differences. Husband asked the trial court "to take judicial notice . . . of the IRS publication for tax brackets for 2019, and the Commonwealth of Virginia's tax brackets for 2019." The trial court rejected a copy of the proposed 2019 federal tax rate schedules but accepted the adopted federal tax rate schedules for 2018 and the adopted Virginia 2019 schedules. No testimony, expert or otherwise, was offered regarding the immediate effect of the tax rates or how they would impact the parties in the future when they began drawing from the retirement accounts, such as the TSP, that were not presently in payment.

During his argument regarding equitable distribution, husband contended,

> The TSP has $191,000 . . . . If it was divided 50-50 we would be looking at approximately $95,000 each. As a pre-tax asset, in order to get the cash equivalent, we would need to do the time value of money, the cost of an early withdrawal, the cost of taxes. We're not asking for all of that. All we want is for the [c]ourt to gross up the number so that we get the pre-tax value of $56,300 in cash.

Husband further asserted that he "has an effective tax rate of approximately 23-percent. In order for the [c]ourt to gross up that number then, it would be multiplying -- or dividing $56,300 by .7777-percent, and the result would be [his] receiving $73,116 from his TSP above the 50-percent that he would already receive under our 50-50 award."

The trial court asked husband to expound upon his request. Husband stated, "[I]f the [c]ourt is going to consider the tax consequences, they have to consider what each item is actually worth to the parties. . . . [T]he party who ends up with the pre-tax asset, if we're just keeping them equal, will always lose; always." He continued, "[W]hen I'm considering the present value, I haven't put into my equation the time value of money, or any early withdrawal penalties. I'm strictly looking at the fact . . . that this is a pre-tax asset, and the factor that the [c]ourt has to consider is the tax implications, in dividing assets under [§] 20-107.3." When the trial court interjected, "Tax implications as to which evidence was presented[,]" husband rejoined, "[W]hat we have presented as evidence is that the TSP is a pre-tax asset . . . and that the parties are paying taxes currently at a certain rate" and referenced the tax schedules he had introduced.

Given that no present payments were being made from the TSP, the trial court noted that neither party would be "paying taxes on this until the money is distributed sometime, and at some kind of formula that the government comes up with at some point, of service, age, and what tax bracket anybody might be in at that point in time." Husband agreed, but added that "they will also not get the benefit of the money until they incur [that] tax liability." During his argument, husband also noted that, even after accounting for an equal division of the martial share of husband's military pension, that husband would be subject to higher taxes, reducing his disposable income.

Wife acknowledged tax consequences as one of the statutory factors, but commented that "the tax consequence to the parties is . . . a nebulous sort of thing," noting that the testimony about

the parties' future tax filing decisions and what the rates would be in the future "was speculative."

She further argued,

> The tax consequence is attributable to both. . . . [I]f this [c]ourt awards [wife] half of the marital share of the military pension, she will have an additional tax consequence, he will have less income. . . . [I]n terms of fairness, we can't say today what the parties will do, with respect to those things that affect the taxes, such as the itemization, the standard deductions, the medical expenses; it's just too nebulous. . . . [W]hile I think we can consider it, I don't think it bears a big impact on the award that you give today; it's not the determining factor.

Ultimately, wife "ask[ed] the [c]ourt for 50-percent of the marital share of the [] military pension, of the TSP, [and] of the FERS retirement." With respect to the parties' debt, wife "propose[d] that we deduct the marital waste straight off the top of what we view to be the total marital debt" and "valu[e] the credit-card debt on the date of separation, the [personal] loan debt on June, 2019, and the school loans" on the date of the hearing. She then "propose[d] to apportion the debt in terms of an income ratio . . . based on today's figures, because there's not an award of the military pension, or any other asset, and . . . that the income ratios would be 21-percent to wife, and 79-percent to husband." She suggested a spousal support award of $2,500 a month.

Husband "ask[ed] for an equal division; 50/50 on the assets, 50/50 on the debts" with the martial debt worth $164,000. Presuming wife's inability to pay her share of the debt, however, husband suggested that her contribution be offset by the TSP, with the amount adjusted based on it being a pre-tax asset. Husband indicated monthly support of $900 would be appropriate.

The trial court issued its ruling from the bench on October 30, 2019. In issuing its ruling, the trial court relayed that it "had the opportunity to review the pleadings and the exhibits introduced as evidence at trial" and that it had "considered the testimony of witnesses, arguments of counsel, observed witnesses in their demeanors, ma[d]e determinations of credibility . . . ."

In addressing equitable distribution, the trial court noted, "I've considered all the factors under Code Section 20-107.3(E) as to when evidence was presented. I'll discuss some of those factors now. If I don't mention a factor, it's not because I haven't considered it." The trial court first summarized the parties' work history and their contributions generally to the marriage. The trial court relayed that "[w]ife made significantly less money than [husband,]" but that "wife made the majority of the non-monetary contributions." The trial court noted wife's 2005 affair, but it determined that "husband's desire to end the marriage due to his [current] relationship" led to the dissolution of the marriage. The trial court stressed what it characterized as husband's "deception as to where he was, [that] he needed to be alone . . . [then initially] agreed to come back to the marriage; and then when confronted, left in the spring of 2018." The trial court further highlighted husband's waste, concluding that he spent almost $13,000 of marital assets for his affair and emphasizing the significance of that amount in relation to the parties' "modest marital estate."

In its explication of the factors, the trial court cited the parties' stipulations to their agreed-to distribution of their tangible personal property and to the classification and valuation of husband's retirement accounts. The trial court further noted that, at trial, "[t]here was some talk of tax consequences to each party, but not significant with regard to the actual accounts that they have. They spoke of filings and things like that." The trial court further recalled that husband was responsible for a separate tax lien, paying $1,000 a month.

The trial court addressed the "debts and liabilities of each spouse" in some detail. Using the balances as of the date of separation and in accordance with the parties' stipulations, the trial court determined the parties had accumulated $34,002 of marital credit card debt and allotted $19,577 to wife and $14,425 to husband. The trial court discussed the outstanding personal loan owed, which had been incurred as two separate loans during the marriage but then consolidated by husband into a new loan after separation. The trial court concluded that "[t]he pre-consolidation two loans of

$17,654 is marital debt . . . ." Finding that husband "incurred additional debt on that" after consolidation, the trial court determined that the additional amount owed was husband's separate debt.

Turning to the student loans, the trial court found that "[t]he student loan for $6,067 is marital debt[ and t]he student loan for $87,210 is marital debt." The trial court more specifically found that "the total debt of $93,273.36 of the student loans is marital debt." Based on its findings, the trial court determined that "the total martial debt is $144,933.36" but then reduced the amount subject to apportionment to $132,477.36 to account for the waste attributed to husband.

In considering the parties' debt, the trial court found "that all these debts were consciously incurred by these parties" during their "lengthy marriage." The trial court found that the parties had no property that could serve as security for their debts and that they had no liquid assets.

The trial court found that "the only property that they really have is the husband's retirement[,]" and after reviewing the evidence related to the factors, the trial court ordered that the marital shares of the retirement accounts be apportioned "55/45 in favor of the wife" and "apportion[ed] th[e marital] debt at a ratio of 22-percent to the wife, and 78-percent to the husband, and that is based on their income."

Upon request for clarification, the trial court reiterated,

> [W]ith regard to the military pension, the [c]ourt finds that the balancing the negative contributions of husband with the affair; with the money that was spent on his affair, and that fact that during the course of the marriage and the husband was military, that the wife worked and held the fort down while husband was . . . deployed . . . . So the [c]ourt balancing all of those factors found in favor of the wife 55-percent and the husband 45-percent.

The trial court further explained that the FERS account was to be split equally. In addition, husband asked the trial court, "[W]hen . . . dividing the debts at 78-22-percent based on income shares, were you just looking at the gross incomes before any of the other stuff?" The trial court replied, "That's

correct, strict incomes. His income and her income." Husband and the trial court confirmed that the stipulated monthly employment incomes of $9,311 and $2,437, respectively, were the basis of the trial court's income shares analysis.

The trial court then "look[ed] at the issue of spousal support, the statutory factors under [Code §] 20-107.1(E)." The trial court noted the "vast difference in their income status." The trial court recounted the "marital decision" the parties had made whereby husband acquired additional education, affording him "a significant jump in income," while wife continued "in the child-care arena." The trial court found that "given their ages, the wife would have to get significant education in order to come close to earning what the husband is earning." The trial court also referenced its award of husband's retirement. The trial court further highlighted "their high debt" and that they "lived significantly over their means." The trial court expressly stated that it specifically had taken "into account . . . that significant debt from the marriage that the [c]ourt . . . has apportioned to husband."

In making its findings, the trial court noted "[h]usband didn't have rent and spen[t] huge amounts of money on entertainment and going out to dinner." More specifically, it "did take into consideration that even though he says he is paying the lease . . . on his girlfriend's apartment, that he really didn't pay that and . . . the [c]ourt didn't find that that was very persuasive that he has that obligation."

With respect to factor thirteen, which relates to "[s]uch factors, including the tax consequences to each party and the . . . factors that contributed to the dissolution . . . as are necessary to consider the equities between the parties," the trial court stated that it "really did not receive any evidence to consider the equities between the parties, other than husband underpaid on his taxes and needed to pay the IRS money." Husband queried, "[T]he tax implications, did that come into play at all?" The trial court responded, "[W]hat I just said is I really didn't have the tax

implications; [they] weren't really argued to me other than the fact that [husband] has a $1,000 [tax lien] that he pays."

Ultimately, the trial court, "[h]aving considered all the above factors, [wife's] need, and [husband's] ability to pay," awarded wife $2,000 in monthly spousal support.

After the trial court issued its bench ruling, both parties filed motions to reconsider. The parties agreed that federal and state law precluded awarding wife more than 50% of the marital share of husband's military retirement benefits. In light of the required reduction of her award, wife requested a favorable adjustment of the remainder of the distribution, including an interest in husband's survivor benefit plan. Wife additionally noted that the trial court "did not fully rule on [her] [m]otion for an [a]lternate [v]aluation date."

Husband challenged the trial court's apportionment of the parties' marital debt. He contended that the trial court "should not have divided the marital debt based on the parties' income because it is not a factor under Code § 20-107.3 . . .[, but t]o the extent the court can use income to divide debts, the court failed to consider the retirement awards, spousal support awards, and tax implications." Husband also argued that wife should not be awarded more than $1,000 in monthly spousal support.

After consideration of the motions to reconsider, the trial court entered a final decree of divorce on June 30, 2020. The parties' stipulations and a transcript of the trial court's October 30, 2019 bench ruling were attached as exhibits. The decree provided that wife be awarded 50% of the marital share of each of husband's three retirement accounts and allocated the credit card and consolidated loan debt per its bench ruling. With respect to the student loans, the trial court found

> that the total amount of student loan debt is Ninety-Three Thousand
> Two Hundred and Seventy-three Dollars and Thirty-Six Cents
> ($93,273.36) all of which is marital and which comprises
> [h]usband's student loan with a balance on the date of the hearing of
> Six Thousand and Sixty-Seven Dollars ($6,067.00) and the parties'
> son's college loans in the amount of Eighty-Seven Thousand and

- 12 -

Two Hundred and Ten Dollars ($87,210.00). Each party shall be responsible for student loan debts in his or her own name.

Based on the trial court's findings and rulings, the final decree ultimately concluded, with regard to equitable distribution, that

the total amount marital debt is $144,933.36, less [h]usband's dissipation and waste of $12,456.00, which yields a sub-total of $132,477.36. Wife shall pay Twenty-Two percent (22%) of the sub-total of $132,477.36 ($29,145.02) and [h]usband pays Seventy-Eight percent (78%) of this amount ($103,332.34). After considering the amounts of marital debt [w]ife is paying on her credit cards pursuant to . . . this Order ($19,577.00), [w]ife shall pay [h]usband a monetary award in the amount of $9,568.02 . . . .

Finally, the decree directed, "[f]or the reasons set forth in the [c]ourt's ruling, . . . the [h]usband shall pay to the [w]ife as and for modifiable spousal support the sum of Two Thousand Dollars ($2,000.00) per month." In conjunction with entry of the final decree, the trial court, by separate orders, granted in part and denied in part the parties' motions for reconsideration.[1]

Husband now appeals, asserting five assignments of error. The first two assignments of error challenge the trial court's equitable distribution decisions regarding the parties' marital debts, and the remaining three assert that the trial court committed errors in crafting the spousal support award.

ANALYSIS

On appeal, "we presume the judgment of the trial court to be correct and . . . sustain its finding unless it is plainly wrong or without evidence to support it." West v. West, 53 Va. App. 125, 132 (2008) (quoting M. Morgan Cherry & Assocs. v. Cherry, 38 Va. App. 693, 702 (2002) (*en banc*)). "[T]he party who asserts the contrary is required to overcome the presumption by record proof." Hart v. Hart, 27 Va. App. 46, 70 (1998) (quoting Broom v. Broom, 15 Va. App. 497, 504

---

[1] Wife, at trial and via motion for reconsideration, had requested an interest in husband's survivor benefit plan, but the trial court denied the request because no evidence of its value was presented at trial.

(1992)). "[W]hen the [trial] court hears evidence *ore tenus*[,] its findings are entitled to the weight of a jury verdict and will not be disturbed unless they are plainly wrong or without evidence to support them." Collins v. Leeds, 69 Va. App. 1, 12 (2018) (quoting Lapidus v. Lapidus, 226 Va. 575, 580 (1984)).

## I. Equitable distribution

"In reviewing an equitable distribution award on appeal, we have recognized that the trial court's job is a difficult one, and we rely heavily on the discretion of the trial judge in weighing the many considerations and circumstances that are presented in each case." Moran v. Moran, 29 Va. App. 408, 417 (1999) (quoting Klein v. Klein, 11 Va. App. 155, 161 (1990)). Accordingly, "a circuit court's 'equitable distribution award will not be overturned unless the [appellate court] finds "an abuse of discretion, misapplication or wrongful application of the equitable distribution statute, or lack of evidence to support the award."'" Dixon v. Dixon, 71 Va. App. 709, 717-18 (2020) (alteration in original) (quoting Anthony v. Skolnick-Lozano, 63 Va. App. 76, 83 (2014)).

Given the stipulations the parties reached that divided items of personal property, ownership of the parties' dog, and various bank accounts, there was not much in the marital estate subject to equitable distribution by the trial court. The trial court noted that the husband's retirement plans were the only real assets to divide with the extensive marital debt being the only other major item subject to equitable distribution.

In his first assignment of error, husband contends that "[t]he trial court erred in considering the parties' income shares in dividing the parties' marital debt." In his second assignment, he asserts error in the manner by which the parties' responsibility for the outstanding student loan debt was assigned, arguing that "[t]he trial court erred in valuing the student loans as of the date of the hearing" resulting in a failure "to consider [his] use of post-separation income to paydown the debt." We consider each argument in turn.

- 14 -

A. Use of income shares to divide the debt

A trial court's equitable distribution of a marital estate's assets and debts is governed by Code § 20-107.3. The factors that a trial court is to consider in making its awards are delineated in Code § 20-107.3(E), which is composed of ten specific factors and an eleventh "catchall" factor. The "catchall" provision directs a trial court to consider "[s]uch other factors as the [trial] court deems necessary or appropriate to consider in order to arrive at a fair and equitable . . . award." Code § 20-107.3(E)(11). Husband contends that the trial court improperly weighed the factors and impermissibly relied on the parties' respective employment incomes, which is not one of the ten specifically delineated factors, in apportioning the marital debt. We disagree.

It is true that a trial court distributing a marital estate "must consider each of the statutory factors[.]" Barker v. Barker, 27 Va. App. 519, 535 (1998) (citing Booth v. Booth, 7 Va. App. 22, 28 (1988)). However, the trial court retains discretion regarding the "weight to assign to each of" the eleven factors. Id. Indeed, "the statutory scheme recognizes . . . that a degree of imprecision will be inevitable in applying the factors of Code § 20-107.3(E)." Owens v. Owens, 41 Va. App. 844, 859 (2003) (ellipsis in original) (quoting Arbuckle v. Arbuckle, 27 Va. App. 615, 618 (1998)).

Here, there can be no serious question that the trial court considered the statutory factors. The trial court stated from the bench that it "considered all the factors under Code Section 20-107.3(E)[,]" then explained in detail its consideration of those factors, and expressly invited the parties to ask any questions either had regarding the trial court's consideration and weighing of the statutory factors. Thus, husband's argument amounts to nothing more than arguing a trial court may not consider the parties' employment incomes in apportioning marital debt.

We disagree. It is hard to conceive of a fact outside of the ten specifically delineated statutory factors that would be more "appropriate to consider in order to arrive at a fair and equitable" assignment of marital debt than the income of the parties. Code § 20-107.3(E)(11).

- 15 -

Although, in other cases, other factors may dictate a different result, the trial court, having considered the statutory factors, concluded that a division of debt that closely tracked the parties' respective incomes was appropriate.[2] Given the totality of the circumstances, which included a lack of other liquid assets, such a conclusion is reasonable. Accordingly, the trial court did not err in the apportionment of the marital debt.[3]

### B. Valuation date for the student loan debt

Husband next contends that the trial court valued the date of the student loan debt as of the date of the equitable distribution hearing as opposed to the date of separation and that doing so

---

[2] Our decision in Reid v. Reid, 7 Va. App. 553 (1989), does not require a different result. In making its equitable distribution award, the trial court in Reid not only divided the parties' property, but also ordered that the husband make an additional cash payment based upon his "superior earning capacity" going forward. Id. at 563. We reversed, holding "that [equitable distribution] does not contemplate consideration of earning capacity of one spouse and support needs of the other spouse, which are expressly embodied in Code § 20-107.1 and are more appropriately determined" as a matter of spousal support. Id. at 565. Unlike the situation in Reid, the trial court's decision here was not simply moving funds between husband and wife, but rather, was a determination of the parties' respective liabilities to third parties for the existing marital debt, a necessary component of an equitable distribution award. See Code § 20-107.3. Furthermore, the trial court's use of income shares in apportioning the debt did not take into account the parties' respective earning capacities going forward, but rather, utilized an existing circumstance, the parties' incomes at the time of the hearing.

[3] In an attempt to support his argument, husband cites Code § 20-107.3(F), which provides that a trial "court shall determine the amount of any such" equitable distribution order "without regard to maintenance and support awarded for either party . . . and shall, after or at the time of such [equitable distribution] determination and upon motion of either party, consider whether an order for support and maintenance of a spouse or children shall be entered or, if previously entered, whether such order shall be modified or vacated." Husband argues that the prohibition on considering any income that a party may receive as a result of a spousal support award represents an implicit prohibition on a trial court considering any income amounts in apportioning debt. The statutory language simply does not support such a contention. Code § 20-107.3(F) bars a trial court from considering the potential entry or modification of a spousal support award in making its decisions regarding equitable distribution; it does not prohibit, implicitly or otherwise, the trial court from considering anything else that falls within the scope of the eleven factors delineated in Code § 20-107.3(E). Because the trial court used the parties' employment incomes without including either the *pendente lite* spousal support award or the spousal support award eventually ordered by the trial court, its apportionment of the marital debt did not violate Code § 20-107.3(F).

constituted reversible error. In support of his argument, he quotes on brief a portion of

Code § 20-107.3(A), which provides that a trial court must

> determine the amount of any such debt as of the date of the last
> separation of the parties, if at such time or thereafter at least one of
> the parties intends that the separation be permanent, and the extent
> to which such debt has increased or decreased from the date of
> separation until the date of the evidentiary hearing.

Husband contends that this language makes valuing the debt at the time of separation mandatory,

and thus, any calculation that does not credit him for any loan payments made in the time period

between separation and the evidentiary hearing is reversible error.

We note that the parties' stipulations conclusively established the value of the student

loan debt at the date of separation. By accepting the stipulations and attaching them as exhibits

to the final decree, the trial court "determine[d] the amount of any such debt as of the date of the

last separation of the parties[.]" Code § 20-107.3(A)(ii). Thus, the essence of husband's

argument is that the trial court lacked authority to use a different value, the amount of student

loan debt at the time of the hearing (also established by the parties' stipulation), in apportioning

the marital debt.

Husband's argument is fatally flawed because it relies upon a truncated quotation of the

debt apportionment provisions of Code § 20-107.3(A). A fuller recitation of those provisions

reads as follows:

> the [trial] court . . . shall determine the nature of all debts of the
> parties, or either of them, and shall consider which of such debts is
> separate debt and which is marital debt. The court shall determine
> the value of any [marital] property as of the date of the evidentiary
> hearing on the evaluation issue. The court shall determine the
> amount of any such debt as of the date of the last separation of the
> parties . . . and the extent to which such debt has increased or
> decreased from the date of separation until the date of the evidentiary
> hearing. *Upon motion of either party . . . the [trial] court may, for*

- 17 -

> *good cause shown, in order to attain the ends of justice, order that a different valuation date be used.*

Code § 20-107.3(A)(ii) (emphasis added).

Here, wife made a motion requesting that the trial court adopt an alternate valuation date for all of the marital debt, including the student loan debt.[4] Thus, pursuant to the very statute on which husband bases his argument, the trial court was authorized to use a different valuation date so long as good cause supported such an alternate date.[5]

Husband makes no argument on appeal that wife failed to make a timely motion or that good cause did not support a different valuation date for the student loan debt.[6] His failure to make such an argument on appeal means that those issues are not before us. Limited to his argument that a trial court lacks authority to use a different valuation date, an argument that is inconsistent with the text of Code § 20-107.3(A)(ii), we cannot say the trial court erred in the valuation of the student loan debt for purposes of equitable distribution.

---

[4] Wife's basis for the motion was that "during the parties' separation, [h]usband serviced the majority of debt, including, but not limited to, school loans, credit cards, and personal loans, with marital funds[.]"

[5] The record on appeal discloses no express ruling by the trial court granting or denying wife's motion for an alternate valuation date. The parties appear to have recognized this in their post-trial motions in the trial court. Nevertheless, wife asserted that while the trial court did not "fully rule" on the motion, it implicitly had in part, because it "actually ruled that the marital portion of the [personal] loan was as of June 2019 (the date that [h]usband increased the amount by $7,215.00)." As with the personal loans, the student loan balances utilized by the trial court in apportioning the debt indicate that the trial court, in effect, resolved the issue in wife's favor at least in part. Acknowledging this implicit ruling, husband, in challenging the debt apportionment and the basis thereof in his post-trial motion in the trial court, argued that, "[t]o the extent the [c]ourt did consider [w]ife's [m]otion, there was no good cause to grant [w]ife's motion for an alternate valuation date."

[6] Although he argued in the trial court that good cause did not exist for utilizing an alternate valuation date of the student loan debt, husband does not make such an argument on appeal. Accordingly, we do not address it.

- 18 -

## II. Spousal support

It is well established that a "trial court has broad discretion in awarding and fixing the amount of spousal support. Accordingly, our review is limited to determining whether the trial court clearly abused its discretion." West, 53 Va. App. at 131 (quoting Miller v. Cox, 44 Va. App. 674, 679 (2005)). "Spousal support determinations typically involve fact-specific decisions best left in the 'sound discretion' of the trial court." Brandau, 52 Va. App. at 641 (quoting McKee v. McKee, 52 Va. App. 482, 489 (2008) (*en banc*)). This discretion "should not be interfered with by an appellate court unless it is clear that some injustice has been done." Joynes v. Payne, 36 Va. App. 401, 423 (2001) (quoting Papuchis v. Papuchis, 2 Va. App. 130, 133 (1986)).

Like equitable distribution, a trial court's consideration of spousal support is governed by statute. See Code § 20-107.1. Code § 20-107.1(E) delineates thirteen factors that a trial court must consider in making a spousal support determination. As with the equitable distribution factors, the statute requires that a trial court *consider* the factors, but it leaves the *weighing* of those factors to the sound discretion of the trial court. Pilati v. Pilati, 59 Va. App. 176, 183 (2011). Accordingly, so long as an "evidentiary foundation exists" to support the factual findings underlying a trial court's spousal support award "and the record discloses that the trial court has given consideration to each of the statutory factors, we will not disturb its determination as to spousal support on appeal." Fox v. Fox, 61 Va. App. 185, 203-04 (2012).

Husband did not contest in the trial court and does not contest on appeal that wife is entitled to some level of spousal support. Rather, he challenges the methodology used by the trial court in calculating the award and the ultimate amount of the award. Specifically, in his third assignment of error, he asserts that "[t]he trial court erred in failing to consider the obligations, needs, and resources of the parties pursuant §20-107.1(E)(1)" in crafting the spousal support award. In his fourth assignment of error, he argues that "[t]he trial court erred in failing to consider the tax

- 19 -

consequences" to the parties of the spousal support award as required by

Code § 20-107.1(E)(13). In his final assignment of error, husband contends that "[t]he trial court

erred in finding that [he] had no expenses related to his residence." We address each assignment

below.

A. Consideration of the parties' obligations, needs, and resources of the parties

Of the thirteen factors that a trial court is required to consider in making a spousal

support determination, the first is "[t]he obligations, needs and financial resources of the parties,

including but not limited to income from all pension, profit sharing or retirement plans, of

whatever nature[.]" Code § 20-107.1(E)(1). Husband asserts that the trial court failed to

consider this factor. Even a cursory review of the record reveals that husband's assertion is

unfounded.

In outlining its spousal support award, the trial court expressly stated that it had

considered "the statutory factors under [Code §] 20-107.1(E)." In detailing its consideration of the

parties' obligations, needs, and resources, the trial court made specific reference to "the vast

difference in their income status" and the "marital decision" the parties had made whereby husband

acquired additional education, affording him "a significant jump in income," while wife continued

"in the child-care arena[.]" The trial court further highlighted its division of the husband's

retirement accounts and the "significant debt from the marriage that [it] . . . apportioned to

husband." Because the record conclusively demonstrates that the trial court considered the factor

specified in Code § 20-107.1(E)(1) in making its spousal support award, husband's third assignment

of error is without merit.[7]  To the extent husband contends the trial court failed in properly considering this factor because it particularly did not consider tax implications or claimed rent as part of husband's obligations and needs, his argument is also without merit, as we explain below.

### B.  Consideration of the tax consequences

In his next assignment of error, husband contends that "[t]he trial court erred in failing to consider the tax consequences" to the parties of the spousal support award as required by Code § 20-107.1(E)(13).  In support of his argument, he cites the trial court's statement that "the tax implications . . . weren't really argued to me other than the fact that [husband] has a $1,000 a month lien, tax lien, that he pays."  From this statement, he reasons that the trial court must have ignored the fact that husband, based on his income, is and may continue to be in a higher tax bracket than wife.  Viewing the record as a whole, we disagree with husband that the trial court's statement is sufficient to establish that the trial court committed reversible error.

Husband correctly notes that, in crafting a spousal support award, a trial court is required to "consider . . . the tax consequences to each party . . . as are necessary to consider the equities between the parties."  Code § 20-107.1(E)(13).  Such consideration, however, is limited by the evidence the parties present.  See Duva v. Duva, 55 Va. App. 286, 300 (2009) (recognizing that a trial court's conclusions regarding the statutory spousal support considerations "must have some foundation based on the evidence presented" (internal quotation marks and citations omitted)).

---

[7] In reality, husband's claim that the trial court failed to consider the Code § 20-107.1(E)(1) factors is not that the trial court did not consider them, but rather, is an argument that, if weighed differently, these factors could have led to a result more favorable to husband.  As noted above, we do not review the absolute weight a trial court gives a particular Code § 20-107.1(E) factor or the relative weighting that it gives one factor when compared to the remaining thirteen so long as it does not amount to an abuse of discretion.  Given all of the facts and circumstances before the trial court, its spousal support decision clearly fell within the "bell-shaped curve of reasonability governing our appellate review[,]" Hamad v. Hamad, 61 Va. App. 593, 607 (2013), and thus, does not constitute reversible error.

Here, there can be no dispute that the trial court heard evidence about and considered at least some tax consequences faced by the parties. After all, in announcing its ruling, the trial court recited and relied upon the evidence it had heard regarding husband's tax lien.

Despite this recital, husband argues that he adduced additional tax evidence that he contends the trial court impermissibly ignored. Specifically, he sought and gained admission of the adopted federal tax rate schedules for 2018 and the adopted Virginia 2019 schedules. With evidence of the parties' incomes already before the trial court, husband notes that this evidence established that, because husband's employment income was significantly higher than wife's, his "tax obligation on income earned from employment would be higher than [w]ife's tax obligation on the same." He contends that the trial court's statements indicate it "failed to properly contemplate that" fact.

Although husband offers a plausible interpretation of the trial court's statements, other readings are plausible given the record as a whole and the full context of all of the trial court's comments. As noted above, we review the record in the light most favorable to wife because she was the prevailing party in the trial court. Brandau, 52 Va. App. at 635. Furthermore, as we have noted on many occasions,

> we presume trial judges know the law and correctly apply it. An appellant can rebut the presumption by showing, either by the ruling itself or the reasoning underlying it, the trial judge misunderstood the governing legal principles. We are particularly skeptical of appellate efforts to piece together such a conclusion from fragmented remarks from the bench. And we decline invitations to fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied.

Hamad v. Hamad, 61 Va. App. 593, 602 (2013) (internal quotation marks and citations omitted).

Viewed through this prism, the trial court's statements do not establish that it committed reversible error by ignoring the tax consequences of its award. The record is replete with

- 22 -

instances in which the trial court engaged in colloquies with counsel for the parties regarding tax issues and implications related to both the spousal support award and the equitable distribution of husband's retirement accounts. Clearly, the trial court considered tax issues in crafting its decision.

Given the totality of the record and the standard of review, the trial court's statements about a lack of evidence and argument regarding tax consequences are properly read as husband having failed to offer any convincing reason why the tax consequences merited a change in the spousal support award. After all, husband's evidence in this regard was nothing more than tax rate schedules, the historical tax rates applied to the parties' prior returns, and the parties' respective incomes coupled with his argument that he was in a higher tax bracket. No testimony, expert or otherwise, established which brackets each might fall within given various potential rulings by the trial court or what the dollar amount of being in different brackets as a result of such a ruling from the trial court was likely to be each year. Other than arguing the general principle that people in higher brackets pay more and demonstrating how that had played out in the past, husband's presentation was nothing more than providing incomes and tax rate tables and sending the trial court off to conduct calculations about any conclusion it might reach. As many trial courts would, the trial court appears to have found the presentation unpersuasive and certainly concluded that nothing about the tax bracket evidence presented warranted a different result. This was not error.

In reaching this conclusion, we stress the "broad discretion" a trial court enjoys "in awarding and fixing the amount of spousal support." West, 53 Va. App. at 131. Accepting husband's argument that he would pay taxes at a higher rate does not require an adjustment to the trial court's spousal support award. Code § 20-107.1(E)(13)'s mandate is that the trial court consider tax consequences; it does not entitle a litigant to a particular result or a lessening of an

- 23 -

award because it is only one of the thirteen delineated statutory factors that the trial court must consider and balance to achieve an appropriate result. Code § 20-107.1(E). Given the trial court's findings regarding the "standard of living established during the marriage[,]" Code § 20-107.1(E)(2), husband's affair that ended the marriage representing a negative, nonmonetary contribution "to the well-being of the family[,]" Code § 20-107.1(6), the parties' "earning capacit[ies], including the skills, education and training of the parties[,]" Code § 20-107.1(E)(9), and "[t]he decisions regarding employment, career, economics, education and parenting arrangements made by the parties during the marriage and their effect on present and future earning potential, including the length of time one or both of the parties have been absent from the job market[,]" Code § 20-107.1(E)(11), it is clear that any differences in marginal tax rates reasonably were viewed by the trial court as relatively insignificant. Such differences did not merit a different spousal support award given the totality of the circumstances, and thus, the record is insufficient to establish that the trial court erred in the manner asserted by husband.

### C. Consideration of husband's expenses

Husband correctly asserts that, in crafting a spousal support award, a trial court is required to consider the living expenses of a party. See Code § 20-107.1(E)(1) (providing that the trial court must "consider . . . [t]he obligations[ and] needs . . . of the parties" in determining spousal support). On appeal, husband asserts that "[t]he trial court erred in finding that [he] had no expenses related to his residence[,]" specifically the $600 a month he claims to pay in rent for the residence he shares with his now girlfriend.

Although a trial court must consider the parties' expenses in crafting a spousal support award, its consideration is cabined by the evidence actually presented. Duva, 55 Va. App. at 300. If the evidence fails to establish an expense, the trial court has nothing to consider.

- 24 -

Furthermore, given its role as factfinder, the trial court remains free to find evidence or testimony incredible or unworthy of belief. See, e.g., Wright v. Wright, 61 Va. App. 432, 450 (2013) (recognizing that it is the trial court's responsibility to "ascertain[] . . . witness' credibility [and] determine[] the weight to be given to" each witness' testimony, leaving the trial court free "to accept or reject any of the witness' testimony" (quoting Street v. Street, 25 Va. App. 380, 387 (1997) (en banc))).

Here, the parties stipulated that husband and his now girlfriend "live together . . . [and] share the costs of living expenses . . . ." The stipulation, however, did not address how those living expenses were allocated or the amount of those living expenses paid for by husband, requiring additional evidence to establish those amounts with sufficient precision to allow the trial court to utilize them in crafting the spousal support award.

To address this evidentiary void, husband points to an expense statement he filled out that listed his rent expense as $600 a month and testimony he gave regarding his shared expenses, including his purported share of the rent. In testifying about his expenses, husband claimed that his rent and other living expenses (utilities, cable, etc.) were far below market because "of the kindness of friends" and noted that the reduced amounts he paid for some of the expenses was the result of his willingness to pay for the relatively high dining and entertainment expenses he and his now girlfriend incurred. Furthermore, in attempting to justify these expenses, husband acknowledged that, when he initially left the marital home, "*I was living rent free*, and I wasn't paying for any of the utilities, I wasn't paying for entertainment or for cable. Someone helped me out in a high-rent area. I wasn't able to afford two addresses at the same time, so I was grateful." (Emphasis added).

Despite his own testimony that, at least for a time after leaving the marital home, he was living "rent free[,]" husband contends that the trial court was *required* to conclude his living expenses at the time of the hearing included at least $600 a month in rent because his income and

- 25 -

expense statement so stated and he testified to the same. His argument ignores that the trial court, as factfinder, could find that his claims in this regard were not credible. See Wright, 61 Va. App. at 450.

Having heard and considered husband's testimony regarding periods of living rent free and then his claim of receiving discounted rent in exchange for his willingness to pay for dining and entertainment, the trial court simply did not believe husband's claims that he was incurring such a rental expense. Specifically, the trial court found that "[h]usband didn't have rent" and "that even though he says he is paying the lease of his girlfriend on his girlfriend's apartment," it "didn't find that that was very persuasive that he has that obligation." In short, the trial court determined that husband's claims regarding a $600 a month rent expense were not worthy of belief, and therefore, it was not required to include such a figure in its spousal support calculation.[8] Accordingly, the trial court did not commit reversible error.

### CONCLUSION

Based on the foregoing, we find no abuse of discretion in the trial court's apportionment of the parties' marital debt or in its award of spousal support. Accordingly, we affirm the judgment of the trial court.

Affirmed.

---

[8] Furthermore, we note that, given the broad discretion a trial court is granted in crafting a spousal support award, West, 53 Va. App. at 131, a change in the amount of support awarded to wife would not be required even if the trial court accepted as true husband's claim that he spends $600 a month for rent.